2010 UT App 243

Tom **WATKINS**, an individual, Plaintiff and Appellant,

v.

Henry Day **FORD**, a Utah corporation, Defendant and Appellee.

No. 20090542–CA.

Court of Appeals of Utah.

Sept. 2, 2010.

---

P. Bryan Fishburn, Salt Lake City, for Appellant.

Robert W. Hughes, Salt Lake City, for Appellee.

Before Judges DAVIS, ORME, and THORNE.

## OPINION

DAVIS, Presiding Judge:

¶ 1 Plaintiff Tom Watkins appeals the judgment of the trial court resolving his contractual dispute with Defendant Henry Day Ford (Henry Day). Watkins argues that the trial court erred in several respects in its decision. We reverse and remand for further proceedings.

## BACKGROUND

¶ 2 At the North American Auto Show in January 2002, Ford Motor Company (Ford) unveiled a GT40 concept car, which was designed to resemble the legendary race car of the same name that had achieved great success in the 1960s. When the concept car received an extremely positive reception at

the auto show, Ford announced that it would commence production of a street-legal version of the car. When Watkins, the owner of a non-Ford auto dealership, became aware of this, he tried to find a Ford dealership that would take his order for one of the newly-announced cars. After some searching, Watkins met with a representative of Henry Day in early March 2002, who ultimately told Watkins that if Henry Day was allocated such cars, it would be willing to sell two of them to Watkins.

¶ 3 Watkins and Henry Day then entered into two contracts finalizing their agreement. One contract provided for the sale of the first GT40 Henry Day received and the other provided for the sale of the second GT40 received. At this time, Watkins gave Henry Day a check for $2000, which represented a $1000 down payment on each of the anticipated cars. The contracts were amended the following day to show that the agreed-upon purchase price for the cars was the manufacturer's suggested retail price (MSRP). Because the parties did not know when the cars would be produced, there was no model year or delivery date specified in the contracts. And because it was uncertain whether Henry Day would even receive one of the cars, the parties understood that the receipt of the cars was a condition precedent to the obligations to buy and sell under the contracts, although this understanding was not incorporated into the language of the contracts.

¶ 4 Several months later, in December 2002, Henry Day's general manager called a Ford representative to determine whether Henry Day would be allocated any of the GT40s. Ford's response was that the only way Henry Day would be allocated any GT40s was by winning certain company awards, which awards Henry Day had never before won in its forty-year history. Thus, Henry Day, considering it quite unlikely that it would receive any GT40s, decided to return Watkins's deposit to him. In a letter dated December 31, 2002, Henry Day told Watkins, "We regret to inform you that our allocation is not going to allow us to receive this vehicle," and included a $2000 check for the refund of Watkins's deposit. Watkins negotiated the check without objection or any

further discussion of the matter with Henry Day representatives.

¶ 5 At some point thereafter, it became clear that Ford would be calling the newly-announced car simply the GT and not the GT40. Several new GTs were manufactured in time for and used during Ford's centennial celebration in June 2003. But the first of the new cars sold to the public was a 2005 model, sold in August 2003 and delivered in late 2004.

¶ 6 Notwithstanding Henry Day's prior award history, the dealership did receive awards for the years 2003 and 2004 that ultimately resulted in Henry Day receiving three Ford GTs. The first car was allocated in December 2004 and the second was allocated in May 2005, the cars having MSRPs of $156,595 and $156,945, respectively. Shortly after the second allocation, one of Watkins's employees told Watkins that she had heard that Henry Day had received two Ford GTs. Watkins immediately went to the dealership, checkbook in hand, and insisted that Henry Day abide by the parties' contracts and sell him the two Ford GTs for MSRP. Henry Day's representative refused, insisting that the contracts were no longer in force, and offered to instead sell Watkins one of the cars for $250,000. Watkins refused the offer.

¶ 7 Watkins filed suit against Henry Day in the beginning of July 2005 for breach of contract. Toward the end of the summer of 2005, Henry Day eventually offered to sell Watkins a Ford GT for MSRP. Watkins, who argues that the market value of the cars had "dropped significantly" by this time, refused Henry Day's offer.

¶ 8 The case ultimately proceeded to a bench trial. The trial court ruled in Henry Day's favor, determining that (1) there was no breach of contract because the contracts unambiguously provided for the sale of GT40s and Henry Day never received any such cars, (2) Watkins had abandoned the contracts and waived his rights thereunder when he negotiated the $2000 check refunding his deposit, and (3) Watkins had failed to mitigate his damages when he refused Henry Day's eventual offer to sell one of the Ford GTs for MSRP. And due to Henry Day's prevailing on the issues, the trial court

awarded Henry Day its reasonable attorney fees and costs in accordance with the terms of the contracts. Watkins now appeals the trial court's determinations.

## ISSUES AND STANDARDS OF REVIEW

¶ 9 Watkins first argues that the trial court erred in determining that the contracts between the parties were not ambiguous and in interpreting those unambiguous terms of the contracts. These are both questions of law that we review for correctness. *See Home Sav. & Loan v. Aetna Cas. & Sur. Co.*, 817 P.2d 341, 347 (Utah Ct.App.1991) ("The interpretation of a contract normally presents a question of law.... The question of whether a contract provision is ambiguous, i.e., susceptible to two or more reasonable interpretations, is also a question of law.").

¶ 10 Watkins next argues that the trial court erred when it determined that by negotiating the $2000 check from Henry Day, he abandoned the contracts and waived his rights thereunder. "Where there is dispute as to whether [abandonment] has occurred, it is usually a question of fact, to be determined from the circumstances of the particular case...." *Timpanogos Highlands, Inc. v. Harper*, 544 P.2d 481, 484 (Utah 1975) (footnote omitted). Thus, "we do not reverse unless we are persuaded that the evidence clearly preponderates against the findings." *Id.* Likewise, "the actions or events allegedly supporting waiver are factual in nature and should be reviewed as factual determinations, to which we give a district court deference." *Pledger v. Gillespie*, 1999 UT 54, ¶ 16, 982 P.2d 572.

¶ 11 Finally, Watkins argues that the trial court erred in determining that he failed to mitigate any damages. "[W]e review a trial court's conclusions as to the legal effect of a given set of found facts for correctness."

*Jeffs v. Stubbs*, 970 P.2d 1234, 1244 (Utah 1998).

## ANALYSIS

### I. Ambiguity

¶ 12 The trial court determined that the contracts at issue here are "clear and unambiguous and were intended to be a final and complete expression of the parties' bargain."[1] The trial court therefore determined that because each contract was facially unambiguous, providing specifically for the sale of a Ford GT40, this was the exact name of the car that was to be provided under the contracts and that because Henry Day never received any vehicles bearing that exact name, it did not breach the contracts.

¶ 13 The Utah Supreme Court has established "a two-part standard for determining facial ambiguity." *Daines v. Vincent*, 2008 UT 51, ¶ 26, 190 P.3d 1269. First, the trial court must determine whether the contract is facially ambiguous. *See id.*

When determining whether a contract is ambiguous, any relevant evidence must be considered. Otherwise, the determination of ambiguity is inherently one-sided, namely, it is based solely on the extrinsic evidence of the judge's own linguistic education and experience. Although the terms of an instrument may seem clear to a particular reader—including a judge—this does not rule out the possibility that the parties chose the language of the agreement to express a different meaning. A judge should therefore consider any credible evidence offered to show the parties' intention.

While there is Utah case law that espouses a stricter application of the rule and would restrict a determination of whether ambiguity exists to a judge's de-

---

1. It seems that the trial court relied in part on the integrated nature of the contracts in making its determination. Similarly, Henry Day relies on the integration clause of the contracts to argue that extrinsic evidence may not be considered in the ambiguity determination. Although we agree with the trial court and Henry Day that the contracts are integrated, this conclusion does not have the result that Henry Day suggests. It is true that "in the face of a clear integration clause, extrinsic evidence of a separate oral agreement is not admissible *on the question of integration.*" *Tangren Family Trust v. Tangren*, 2008 UT 20, ¶ 17, 182 P.3d 326 (emphasis added). But the question of integration is merely the first step in the analysis, after which we proceed to the question of whether there is an ambiguity in the contracts, *see id.* ¶ 18, which exercise, as we discuss in our analysis above, allows resort to some extrinsic evidence.

termination of the meaning of the terms of the writing itself, the better-reasoned approach is to consider the writing in light of the surrounding circumstances. Rational interpretation requires at least a preliminary consideration of all credible evidence offered to prove the intention of the parties . . . so that the court can place itself in the same situation in which the parties found themselves at the time of contracting.

*Ward v. Intermountain Farmers Ass'n*, 907 P.2d 264, 268 (Utah 1995) (omission in original) (citations and internal quotation marks omitted). Second, after considering evidence of ambiguity, the trial court "must ensure that the interpretations contended for are reasonably supported by the language of the contract." *Daines*, 2008 UT 51, ¶ 26, 190 P.3d 1269 (internal quotation marks omitted). If they are, "then extrinsic evidence is admissible to clarify the ambiguous terms"; otherwise, "the parties' intentions must be determined solely from the language of the contract." *Ward*, 907 P.2d at 268.

¶ 14 We agree with the trial court that there exists no facial ambiguity in either of the contracts at issue here. When we look, as we must, to the evidence presented regarding the facts known to the parties and the circumstances present at the time the parties were contracting, it is clear that the parties' use of the term GT40 is susceptible to only one interpretation and was intended to represent only one thing. Considering that Ford had just recently made the announcement regarding the production of a street-legal version of the GT40 and that this prompted Watkins's search for a dealership that would sell him one,[2] it is obvious that this is the type of car for which the parties were contracting. Indeed, the Henry Day representative who signed the contracts testified to this effect, stating unequivocally and repeatedly that he shared Watkins's understanding regarding the model of car being discussed:

Q. Now the cars that were the subject of this contract were brand new product, were they not?

A. Yes.

. . . .

Q. Now, you understood that the automobiles that were the subject of these contracts [were] the yet to be produced Ford GT concept car or the GT40 as it was called at that time, correct?

A. Correct.

The evidence of the circumstances surrounding the contract formation and the situation of the parties at the time of contract formation simply does not indicate any other understanding on the part of either party.[3] And the understanding that the use of the term GT40 referenced the newly-announced street-legal version of the GT40 is certainly supported by the language of the contracts. When the parties chose the term GT40, it was unambiguous and meant just that—the parties were contracting for the sale of what was then known as the GT40. Thus, the use of the term GT40 does not render the contracts facially ambiguous just because the car

---

**2.** Henry Day objects to the various published articles submitted by Watkins to show that the announcement made regarding the GT40 was made just prior to the parties having entered into the contracts and to show that the name of that announced car was ultimately changed to the GT. Henry Day correctly states that nearly all of these articles are not part of the record below and that we therefore may not rely upon those articles on appeal, *see In re L.M.*, 2001 UT App 314, ¶ 16 n. 3, 37 P.3d 1188 ("Our policy has long been, and continues to be, we will not consider new evidence on appeal." (internal quotation marks omitted)). However, one of the articles *was* offered as an exhibit below and we rely on information gleaned from it. Although Henry Day asserts that this exhibit "was found to be hearsay and was not supported by any other credible evidence," this is a gross misrepresentation of what actually occurred. In fact, Henry Day stipulated to the admission of this exhibit at trial and in no way objected to it at any point in the proceedings. Simply because Henry Day successfully objected to one question asked of a witness that may have elicited some of the same information as contained in the exhibit, that does not support the assertion that this exhibit was found to be hearsay.

**3.** Henry Day adamantly argues that we may not consider any evidence of the parties' intent outside the four corners of the contracts. As we set forth above, this is contrary to the law, which requires us to first look at the circumstances surrounding contract formation in determining whether there is an ambiguity.

model ultimately produced was named simply the GT.

¶15 Although we have determined that in looking at the face of the contracts there is no ambiguity with regard to the term GT40, our inquiry does not necessarily end there:

> Under Utah law, if the initial review of the plain language of a contract, within its four corners, reveals no patently obvious ambiguities, the inquiry into whether an ambiguity exists in a contract does not always end there. Utah's rules of contract interpretation allow courts to consider *any* relevant evidence to determine whether a latent ambiguity exists in contract terms that otherwise appear to be unambiguous.

*Gillmor v. Macey*, 2005 UT App 351, ¶35, 121 P.3d 57. A latent ambiguity is "[a]n ambiguity that does not readily appear in the language of a document, but instead arises from a collateral matter when the document's terms are applied or executed." *Black's Law Dictionary* 93 (9th ed.2009). Thus, if a contract, "while on its face appearing to be certain, would open up an ambiguity when attempts were made to apply it to the subject-matter, then such ambiguity could be resolved by evidence of what meaning the parties themselves intended to invest such terms." *Bamberger Co. v. Certified Prods., Inc.*, 88 Utah 194, 48 P.2d 489, 494 (1935); *see also Fox Film Corp. v. Ogden Theatre Co.*, 82 Utah 279, 17 P.2d 294, 296 (1932) ("One well-recognized exception to the [parol evidence] rule is that extrinsic evidence, parol or otherwise, is admissible to explain a latent ambiguity in a writing. This does not mean that terms or conditions may be inserted into or taken out of the writing by direct oral assertions, but it does mean that the court may receive evidence of such surrounding facts as will enable it to look upon the transaction through the eyes of the parties thereto and thereby know what they understood or intended the ambiguous word or provisions to mean.").

¶16 We determine that there is a latent ambiguity in the contracts at issue here, created by Ford's later decision to name the anticipated car the GT instead of the GT40.[4] We thus look to the same evidence of surrounding circumstances as we did above to determine what car the parties intended to buy and sell. Again, it is clear that the parties meant the same thing with their reference to the GT40. And thus, taking the contract term GT40 to reference this car of a slightly different name accomplishes the concordant intent that the parties had when contracting, that is, it provides for the sale of two of the cars that Ford announced and produced on the heels of the GT40 concept car that was unveiled at the 2002 auto show. Because Henry Day received three such cars and did not sell two to Watkins for MSRP, Henry Day breached the contracts—assuming they had not been abandoned and that Watkins had not waived his rights thereunder.

## II. Abandonment/Waiver

¶17 The trial court determined that Watkins had abandoned the contracts and waived his rights thereunder by his acceptance of Henry Day's return of his deposit. Waiver and abandonment involve the intentional relinquishment of a known right. *See Soter's, Inc. v. Deseret Fed. Sav. & Loan Ass'n*, 857 P.2d 935, 942 (Utah 1993) ("A waiver is the intentional relinquishment of a known right. To constitute waiver, there must be an existing right, benefit or advantage, a knowledge of its existence, and an

---

4. Henry Day somewhat disingenuously argues that it is not clear that there was a name change from the GT40 to the GT and that they could be references to different cars. However, we see ample evidence of this name change. First, there is the article before the trial court that calls the concept car the GT40 and calls the production model based thereon the GT. While Henry Day argues that the article uses the terms GT40 and GT "interchangeably," we think that the article doing so would be even more of an indication that the two terms reference the same car. Second, Henry Day's general manager testified that although he was not personally certain, he believed that the GT had earlier been introduced as the GT40 and that the evidence showed that. Third, the findings of fact state that in December 2002, Henry Day's general manager called its Ford representative, who said that Henry Day would not "be allotted any Ford *GT40's* unless [Henry Day] won [certain awards]." (Emphasis added.) But when Henry Day went on to win three of those specified awards, it was allocated three Ford *GTs*.

intention to relinquish it. We further clarify that the intent to relinquish a right must be distinct." (citation and internal quotation marks omitted)); *Lucky Seven Rodeo Corp. v. Clark*, 755 P.2d 750, 753 (Utah Ct.App. 1988) ("Abandonment means the intentional relinquishment of one's rights in the contract; and in order to nullify such rights, there must be a clear and unequivocal showing of such abandonment."). There is simply no intentional relinquishment of a *known* right in this case.

¶ 18 The trial court determined that Watkins demonstrated an intentional relinquishment of his known rights when he negotiated the check returning his deposit "without reservation or objection," particularly in light of Watkins's "experience in the auto dealership industry and both parties' uncertainty as to when and if defendant would receive the contracted vehicles." But even considering both Watkins's experience in the industry—assuming such experience was even relevant to the circumstances of this transaction—and the parties' initial uncertainty as to whether Henry Day would receive the subject cars, there is simply no evidence whatsoever indicating that Watkins knew he still had rights under the contracts at the time he negotiated the check refunding his deposit. The letter accompanying the check was an unequivocal representation by Henry Day that its prior uncertainty regarding allocation had been resolved and that it now knew it would *not* be receiving any of the subject cars. Had this representation been true, then the parties would have known that a condition precedent to the contracts was definitely not going to happen and they therefore would no longer have had any rights or obligations under the contracts.[5] *See Harper v. Great Salt Lake Council, Inc.*, 1999 UT 34, ¶ 14, 976 P.2d 1213 ("Under well-established principles of contract interpretation, where the duty of the obligor to perform is contingent upon the occurrence or existence of a condition precedent, the obligee may not require performance by the obligor, because the obligor's duty, and conversely the obligee's right to demand performance, does not arise until that condition occurs or exists. Failure of a material condition precedent relieves the obligor of any duty to perform." (citation omitted)). *See generally McBride–Williams v. Huard*, 2004 UT 21, ¶ 13, 94 P.3d 175 (" 'Condition precedent' is defined as 'an act or event, other than a lapse of time, that must exist or occur before a duty to perform something promised arises.' " (quoting *Black's Law Dictionary* 289 (7th ed.1999))).

¶ 19 Henry Day seems to argue that notwithstanding the unequivocal representation regarding the condition precedent, Watkins was still required to object to the refund of his deposit to preserve his contractual rights. But we have been referred to no legal authority for this position and can conceive of no policy reason requiring Watkins to distrust Henry Day's representation. There was nothing that would have given Watkins any reason to doubt the accuracy or truth of the information relayed by Henry Day. And the crucial information regarding nonoccurrence of the condition precedent is something that Watkins had no way of independently verifying.[6] Under these circumstances, there was simply no relinquishment by Watkins of a *known* right, and we reverse the trial court on this issue.[7] Because we have

5. In its ambiguity argument, Henry Day argued that Watkins should have requested that the contracts be modified when he discovered that the cars would be released under the name GT as opposed to GT40. Even if we were somehow convinced that Watkins would be under such a burden, Henry Day's argument is unavailing. The name modification apparently occurred subsequent to the letter informing Watkins that the condition precedent in the contracts would not occur. Thus, after receiving this letter, Watkins would have justifiably thought he no longer had any rights under the contracts and would have had no reason to attempt to modify the contractual terms to reflect the name change.

6. Indeed, if we were to impose the burden on Watkins that Henry Day suggests, it appears that in order to ensure he did not abandon his rights under the contracts Watkins would have had to wait until the entire production run of the Ford GTs had been completed and all the cars were delivered to dealerships before negotiating the $2000 check. He would simply have no other way to know with certainty of the failure of the condition precedent of the contracts.

7. The trial court made a finding that Henry Day "returned [Watkins]'s check in good faith and based upon the reasonable belief they would not be allotted any Ford GT40's." But whether Hen-

determined that Henry Day breached the contracts and that Watkins did not abandon the contracts or waive his rights thereunder, we remand to the trial court for a determination of the damages to be awarded to Watkins for Henry Day's breach of the contracts.

### III. Failure to Mitigate

¶ 20 "[U]nder the doctrine of avoidable consequences the nonbreaching party has an active duty to mitigate his damages, and he may not, either by action or inaction, aggravate the injury occasioned by the breach." *Mahmood v. Ross (In re Estate of Ross)*, 1999 UT 104, ¶ 31, 990 P.2d 933 (internal quotation marks omitted).[8] Although Watkins may have had the opportunity and duty to mitigate his damages here, there are not sufficient factual findings by the trial court to support such a conclusion; most importantly, there is no finding as to the actual value of the GT at the time Henry Day eventually offered to sell it to Watkins for MSRP. The lack of findings is probably largely due to the fact that the trial court determined there had been no breach of the contracts and therefore never arrived at a determination of damages. We therefore must vacate the trial court's ruling respecting Watkins's failure to mitigate and remand to the trial court to revisit this issue. On remand, the trial court should make the findings necessary to determine whether Watkins failed to mitigate his damages, including a determination of the value of the subject cars at the time Henry Day offered to sell one to Watkins at MSRP in the late summer of 2005 and whether it would have resulted in a financial benefit to Watkins.

### IV. Attorney Fees

¶ 21 The contracts at issue provided that Henry Day was entitled to recover "reasonable attorney[ ] fees, court costs, and collection fees" should it need to enforce the contracts. And the Utah Code provides a reciprocal right to recover attorney fees:

> A court may award costs and attorney fees to either party that prevails in a civil action based upon any promissory note, written contract, or other writing executed after April 28, 1986, when the provisions of the promissory note, written contract, or other writing allow at least one party to recover attorney fees.

Utah Code Ann. § 78B-5-826 (2008). The trial court awarded Henry Day its reasonable attorney fees and costs due to its prevailing status below. But because we determine that Watkins has prevailed on his breach of contract claims, we reverse the award of attorney fees and costs to Henry Day and remand for the trial court to enter an appropriate award of attorney fees and costs in favor of Watkins, including those fees and costs reasonably incurred on appeal.

### CONCLUSION

¶ 22 First, we determine that the trial court was correct that there was no *facial* ambiguity in the contracts at issue here. However, we determine the later renaming of the car created a latent ambiguity. We therefore consider evidence of the intent of the parties at the time of contracting and determine that the parties intended to buy and sell what is now referred to as a Ford GT, and thus, Henry Day breached the contracts by refusing to sell such cars upon receipt to Watkins for MSRP. Second, we reverse the trial court on the issue of abandonment and waiver because the facts simply do not support the determination that Watkins was intentionally relinquishing any known right. Thus, we remand to the trial court for a determination of the amount of

---

ry Day was acting in good faith by making an educated guess is irrelevant—it does not change the information actually given to Watkins, which information tells us whether Watkins was relinquishing a *known* right.

Further, notwithstanding any good faith, the unequivocal statement from Henry Day was simply incorrect. *See generally* 31 C.J.S. *Estoppel & Waiver* § 218 (2008) ("A waiver may not be claimed by one whose false representation is the

foundation of the waiver."). Henry Day knew that there existed some possibility, no matter how slim, that Henry Day would get one of the subject cars.

8. It is Henry Day that bears the burden "to prove with reasonable certainty" the amounts that were made or could have been made in mitigation. *See Pratt v. Board of Educ.*, 564 P.2d 294, 297–98 (Utah 1977) (internal quotation marks omitted).

damages to be awarded to Watkins. Third, the trial court did not make findings necessary to determine whether the facts here show a failure by Watkins to mitigate his damages. We therefore vacate the trial court's mitigation determination and remand to the trial court for further consideration of this matter. Finally, in light of the outcome on appeal, we reverse the award of attorney fees and costs in favor of Henry Day and remand for the trial court to determine an appropriate award of attorney fees and costs to Watkins.

¶ 23 I CONCUR: GREGORY K. ORME, Judge.

THORNE, Judge (concurring in part and dissenting in part):

¶ 24 I concur in the analysis of Parts I and III of the majority opinion. However, I respectfully dissent from the majority's reversal of the trial court's abandonment determination in Part II and therefore dissent from Part IV as well. I do not agree with the majority's determination that Watkins's negotiation of the return of deposit check was not an intentional relinquishment of his contractual rights. *See supra* ¶ 19.

¶ 25 The contracts entered into between the parties gave Watkins a right to purchase two of the subject cars contingent upon allocation of the cars to Henry Day. However, "[a] contract may be [abandoned] by acts or conduct of the parties inconsistent with the continued existence of the contract." *Harris v. IES Assocs., Inc.*, 2003 UT App 112, ¶ 37, 69 P.3d 297 (second alteration in original) (internal quotation marks omitted). In this case, both parties undertook acts inconsistent with the continued existence of the contracts.[1]

¶ 26 Henry Day acted inconsistently with the contracts when it refunded the deposit Watkins gave as security for the performance of the contracts. Watkins acted inconsistently when he accepted the return of his deposit and negotiated the deposit check.

These actions demonstrate the parties' unequivocal expressions of an intent to abandon the contracts. If Watkins, after receiving the refund check and letter from Henry Day indicating its desire to abandon the contracts, wanted to maintain rights under the contracts, he should not have taken actions that were inconsistent with the continued existence of the contracts. Instead of either seeking a clarification or asserting ongoing rights, Watkins negotiated the deposit check. The result was that both parties acted as if the contracts had been rescinded.

¶ 27 Watkins's negotiation of the deposit check indicated his agreement to "walk away" from the deal and abandon the contracts. By negotiating the returned deposit check, Watkins released Henry Day of its obligation to sell any future allocation of the subject cars to Watkins and Henry Day relinquished its right to enforce purchase at the manufacturer's suggested retail price (MSRP) of the cars if they were allocated to Henry Day. The issuance of the deposit check and Watkins's negotiation of the check without any visible attempt to claim continuing rights demonstrated an unequivocal representation of intent to abandon the contracts. *See generally Lucky Seven Rodeo Corp. v. Clark*, 755 P.2d 750, 753 (Utah Ct. App.1988) (stating that abandonment is the intentional relinquishment of one's right in the contract). Because Watkins abandoned the contracts, I would not permit Watkins to enforce the sale of the subject cars pursuant to those contracts. Likewise, if the situation were reversed and Henry Day was attempting to enforce the sale of the subject cars, for example if the market value dropped significantly below MSRP before delivery of the cars to Henry Day, I would not likewise permit Henry Day to enforce the contracts.

¶ 28 I also do not agree with the majority opinion that Watkins could not have relinquished his rights because Watkins was unaware, after Henry Day's negative representation regarding allocation, that there

---

1. It is possible that the parties' actions of mutual abandonment of the contracts in this case may amount to a manifestation of mutual assent to rescind the contracts. *See generally Forsyth v. Pendleton*, 617 P.2d 358, 361 (Utah 1980) (per curiam) ("[W]hen the intent to abandon by one party is coupled with the equal intention of the other party, such mutual abandonment may under certain circumstances, be found to constitute rescission of the contract.").

remained a possibility that Henry Day would receive an allocation of the subject cars if the dealership received a sales award. *See supra* ¶ 19. Under the contracts, Watkins had a contingent right to purchase the subject cars regardless of how likely or unlikely the possibility of Henry Day's allocation might be at any given time throughout the duration of the contracts. Henry Day's desire to abandon the contracts based on its own belief that it would not receive an allocation did nothing to change Watkins's contingent contractual rights. Thus, the parties' beliefs regarding the probability that Henry Day would receive an allocation of the subject cars is irrelevant. At the time Watkins received the refund check, he had a contingent right to purchase the subject cars *if* later allocated to Henry Day. Watkins, however, relinquished his contractual rights when he negotiated the return of deposit check.

¶ 29 Accordingly, I would affirm the trial court's abandonment determination.