*This opinion is subject to revision before final publication in the Pacific Reporter*

**2013 UT 31**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

TOM WATKINS,
*Plaintiff and Respondent,*

*v.*

HENRY DAY FORD,
*Defendant and Petitioner.*

No. 20100802
Filed May 31, 2013

On Certiorari to the Utah Court of Appeals

Third District, Salt Lake
The Honorable Tyrone E. Medley
No. 20090542

Attorneys:

P. Bryan Fishburn, Salt Lake City, for respondent

Robert W. Hughes, Salt Lake City, for petitioner

JUSTICE PARRISH authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE NEHRING,
JUSTICE DURHAM, and JUSTICE LEE joined.

JUSTICE PARRISH, opinion of the Court:

### INTRODUCTION

¶1 On certiorari, we are asked to decide whether Henry Day Ford (Henry Day) and Tom Watkins abandoned Motor Vehicle Sales Contracts (Vehicle Contracts or Contracts) for the sale of two Ford GT40s; whether the Contracts contained a latent ambiguity regarding the identity of the vehicles to be sold; and, in the event that Henry Day breached the Contracts, whether Mr. Watkins adequately mitigated his damages. The district court granted summary judgment in favor of Henry Day, concluding that the Contracts were not even applicable because they referred to different vehicles than the ones in dispute and, alternatively, that both parties abandoned the Contracts when they acted inconsistently with their continued existence. It also held that Mr. Watkins had failed to mitigate his damages.

¶2 The court of appeals reversed. While it held that there was a latent ambiguity in the Contracts regarding the identity of the vehicles to be sold, it concluded that the ambiguity was of no moment because both parties intended that the Contracts cover the vehicle that is now known as the Ford GT. It reversed the district court on the abandonment issue, holding as a matter of law that Mr. Watkins did not intend to abandon the Vehicle Contracts. Finally, because the court of appeals determined that the district court had made insufficient factual findings to support the conclusion that Mr. Watkins had failed to mitigate his damages, it remanded the case for a hearing on damages. We accepted Henry Day's Petition for Writ of Certiorari.

¶3 We first hold that although the Vehicle Contracts contain a latent ambiguity, the latent ambiguity does not excuse either party's performance under the Contracts because the parties' intent aligned with respect to the vehicles to be bought and sold. We next hold that Henry Day abandoned the Vehicle Contracts by refunding Mr. Watkins's deposit and by conveying its belief that the dealership would not get an allotment of the vehicles. However, because Henry Day's representations regarding the possibility of receiving the vehicles were ambiguous, the issue of whether Mr. Watkins abandoned his rights under the Vehicle Contracts requires a remand for additional factual findings. If the district court concludes that Mr. Watkins did not abandon the Contracts, it must then consider whether Mr. Watkins adequately mitigated his damages.

¶4 We accordingly affirm the court of appeals' determination that the latent ambiguity in the Vehicle Contracts did not absolve the parties of their respective obligations and remand for a determination as to whether Mr. Watkins abandoned his rights under the Contracts and, if necessary, for a determination as to whether Mr. Watkins mitigated his damages.

## BACKGROUND

¶5 Ford Motor Company (Ford) introduced the GT40 concept car at the 2002 North American Auto Show. *Watkins v. Henry Day Ford*, 2010 UT App 243, ¶ 2, 239 P.3d 526. Because the car received a positive public reception at the auto show, Ford announced it would produce a limited number of street-legal GT40s. *Id.* The limited number of GT40s were to be allocated to Ford dealers through a lottery or by receipt of either the Ford President's Award or Ford National Car and Truck Share Award (Share of the Nation

Award) (collectively, Allocation Awards).

¶6    Mr. Watkins, the owner of a Volkswagen dealership, learned of Ford's production plans for the GT40 and decided that he wanted to preorder two GT40s before Ford completed production of the vehicles and delivered them to dealerships. Mr. Watkins contacted numerous Ford dealerships in Utah, including Henry Day, to inquire whether he could preorder GT40s.

¶7    On March 4, 2002, Mr. Watkins met with Steve Kersey, fleet manager at Henry Day. At the time of the meeting, Henry Day did not possess any GT40s and did not know whether Ford would allocate any GT40s to the dealership. Nevertheless, Mr. Watkins and Mr. Kersey executed two Vehicle Contracts for the "1st GT40" and "2nd GT40" ordered by Henry Day (Motor Vehicle Sales Contracts 1 and 2). Mr. Watkins secured each contract with a $1,000 deposit. Both parties understood that each Vehicle Contract was subject to the condition precedent that Ford actually allocate GT40s to Henry Day. Mr. Watkins understood that one avenue for Henry Day to receive allocation of GT40s was if the dealership received the President's Award from Ford.

¶8    Initially, the parties executed the Contracts without specifying a price for the vehicles. The following day, however, Mr. Watkins contacted Mr. Kersey, and the parties agreed to modify the contracts to specify a purchase price equivalent to Manufacturer's Suggested Retail Price (MSRP).

¶9    In December 2002, Henry Day's general manager called the dealership's Ford representative to inquire whether Henry Day would be allocated any GT40s via lottery. The Ford representative informed the general manager that Henry Day, as a smaller dealership, would not be awarded any GT40s unless it won an Allocation Award—either the President's Award or the Share of the Nation Award. At the time of the call, Henry Day had operated for approximately forty years and had never won an Allocation Award.

¶10    Based on the general manager's conversation with Ford, Henry Day sent Mr. Watkins a December 31, 2002 letter that stated, "[w]e regret to inform you that our allocation is not going to allow us to receive this vehicle." The December 31st letter included a $2,000 check refunding Mr. Watkins's deposit for each Vehicle Contract. Mr. Watkins received the check and deposited it on February 19, 2003, without any objection or other communication to Henry Day. Mr. Watkins then reinitiated his search for a Ford

dealership that would permit him to preorder GT40s, contacting dealers throughout the western and midwestern United States.

¶11 At some point after Henry Day returned Mr. Watkins's deposit, Ford renamed the production version of the "GT40" concept car the "GT." *Id.* ¶ 5.

¶12 Over one year later, in February 2004, Henry Day learned from Ford that it had won the Share of the Nation Award based on its 2003 vehicle sales. As part of the award, Ford allocated one GT to Henry Day. Then, in April 2004, Ford notified Henry Day that it had won the President's Award based on its 2003 vehicle sales and allocated a second GT to Henry Day. And in February 2005, Henry Day learned that it had won a second President's Award based on its 2004 vehicle sales and that it would receive a third GT.

¶13 On June 8, 2005, Mr. Watkins's business manager learned that Henry Day had been allocated GTs, and he informed Mr. Watkins. Despite having had no contact with Henry Day since receipt of the dealership's December 31st letter, Mr. Watkins went to the dealership and demanded that Henry Day sell him two GTs at the MSRP of $156,945. Henry Day instead offered to sell Mr. Watkins one GT for $250,000. Mr. Watkins refused the offer and filed a complaint alleging breach of contract and unjust enrichment.

¶14 The district court conducted a bench trial, entered findings of fact and conclusions of law, and ruled in favor of Henry Day. It held that the Vehicle Contracts were "clear and unambiguous," finding that the Vehicle Contracts specified that Henry Day would sell "GT40s" to Mr. Watkins, not the "GTs" that Ford ultimately delivered to Henry Day. As a result, the district court held that the Vehicle Contracts did not require Henry Day to sell GTs to Mr. Watkins and that Henry Day did not breach the contracts. Alternatively, the district court held that both parties abandoned the Vehicle Contracts by engaging in conduct inconsistent with their continued existence. Specifically, the district court found that Henry Day acted inconsistently with the Vehicle Contracts by refunding Mr. Watkins's deposit, and Mr. Watkins acted inconsistently with the contracts by accepting and depositing the refund check without objection. While the district court did not enter a clear conclusion regarding waiver, it implied that Mr. Watkins's conduct also resulted in a waiver of his rights under the Vehicle Contracts. Finally, the district court determined that "[Mr. Watkins's] refusal to purchase the Ford GT constitute[d] a failure . . . to mitigate his

damages." Based on these findings and the terms of the Vehicle Contracts, the district court ruled in favor of Henry Day and awarded the dealership its attorney fees and costs.

¶15 Mr. Watkins appealed and the Utah Court of Appeals reversed. *Id.* ¶ 22. The court of appeals held that the Vehicle Contracts contained a latent ambiguity regarding the identity of the vehicles to be sold, but that the parties intended to sell and buy the production model of the GT40—which Ford designated the "GT." *Id.* It therefore concluded that Henry Day breached the Contracts by refusing to sell two GTs to Mr. Watkins for MSRP. *Id.* ¶ 16. Next, the court of appeals treated waiver and abandonment as identical legal theories, reasoning that both involve the "intentional relinquishment of a known right." *Id.* ¶ 17. It held that Henry Day's December 31st letter was an unequivocal representation that the condition precedent to the Vehicle Contracts had failed, i.e., that the dealership would not receive any of the contracted-for vehicles. *Id.* ¶ 18. It then concluded that, at the time of the dealership's December 31st letter, Mr. Watkins did not know he still had rights under the Vehicle Contracts and therefore could not have relinquished a "known" right. *Id.* ¶¶ 18–19. The court of appeals then determined that the district court's findings of fact were insufficient to support its conclusion that Mr. Watkins had failed to mitigate his damages and it remanded that issue for additional factual findings. *Id.* ¶ 20. Finally, the court of appeals instructed the district court to award attorney fees and costs to Mr. Watkins. *Id.* ¶ 21.

¶16 Judge Thorne filed a separate opinion. He concurred in the majority's holding that Henry Day had breached the Vehicle Contracts and that the district court had made insufficient factual findings to determine whether Mr. Watkins had failed to mitigate his damages. *Id.* ¶ 24. Judge Thorne dissented, however, from the majority's holding that the parties had not abandoned the Vehicle Contracts. *Id.* ¶¶ 24–25. He would have affirmed the district court, including the award of attorney fees to Henry Day. *Id.* Judge Thorne reasoned that Henry Day had acted inconsistently with the Vehicle Contracts by refunding Mr. Watkins's deposit and Mr. Watkins had acted inconsistently with the Contracts by depositing the refund check without objection. *Id.* ¶ 26. Judge Thorne disagreed with the majority's contention that Mr. Watkins no longer knew he had rights under the Vehicle Contracts after receiving Henry Day's December 31st letter. *Id.* ¶ 28. He reasoned

that Mr. Watkins's contingent right to purchase GT40s under the Vehicle Contracts bore no relationship to the likelihood that Henry Day would actually receive the GT40s from Ford. *Id.* Judge Thorne also reasoned that Henry Day's desire to abandon the Vehicle Contracts did not affect Mr. Watkins's contingent rights under the contracts. *Id.*

¶17 Henry Day filed a Petition for Writ of Certiorari with this court. We granted the petition and have jurisdiction pursuant to sections 78A-3-102(3)(a) and 78A-3-102(5) of the Utah Code.

## STANDARD OF REVIEW

¶18 "On a writ of certiorari, we review the decision of the court of appeals, not that of the district court, and apply the same standard[s] of review used by the court of appeals." *Coulter & Smith, Ltd. v. Russell*, 966 P.2d 852, 855 (Utah 1998). "We conduct that review for correctness, ceding no deference to the court of appeals." *State v. Brake*, 2004 UT 95, ¶ 11, 103 P.3d 699.

¶19 The court of appeals held first that the Vehicle Contracts were ambiguous. As a general proposition, questions regarding the construction and interpretation of a contract are reviewed as a matter of law and we afford no deference to a lower court's ruling. *O'Hara v. Hall*, 628 P.2d 1289, 1290–91 (Utah 1981). Similarly, "[w]hether a contract is ambiguous is a question of law, which we review for correctness." *Peterson v. Sunrider Corp.*, 2002 UT 43, ¶ 14, 48 P.3d 918. But where an appellate court finds that a contract is ambiguous and looks to extrinsic evidence to determine the intent of the parties, it must give deference to the lower court's findings of fact. *Kimball v. Campbell*, 699 P.2d 714, 716 (Utah 1985).

¶20 The court of appeals next held that Mr. Watkins did not abandon the Vehicle Contracts. What constitutes abandonment of a contract is a question of law that we review for correctness. *Rogier v. Am. Testing & Eng'g Corp.*, 734 N.E.2d 606, 619 (Ind. Ct. App. 2000). Whether a contract has been abandoned, however, presents a question of fact. 17B C.J.S. *Contracts* § 586 (2013). Therefore, while we review the court of appeals' determination for correctness, we afford the district court's factual findings a high degree of deference. *Hughes v. Cafferty*, 2004 UT 22, ¶ 24, n.2, 89 P.3d 148.

¶21 Finally, the court of appeals held that the district court made insufficient findings to conclude that Mr. Watkins failed to mitigate his damages. We review the court of appeals' legal conclusion for correctness. *Morse v. Packer*, 2000 UT 86, ¶ 16, 15 P.3d

1021.

## ANALYSIS

¶22 We granted Henry Day's Petition for Writ of Certiorari to consider three questions. First, "[w]hether a majority of the panel of the court of appeals erred in reversing the district court's determination that the parties abandoned their contracts and that [Mr. Watkins] waived his rights under the contracts." Second, "[w]hether the court of appeals erred in holding that there was a latent ambiguity in the contracts and that [Henry Day] breached the contracts." Third, "[w]hether the court of appeals erred in reversing the district court's determination that [Mr. Watkins] failed to mitigate his damages."

¶23 Because both parties understood that the Vehicle Contracts referred to the production version of Ford's concept car, the "GT40" (sold to the public as the Ford "GT"), we hold that the latent ambiguity in the Contracts regarding the identity of the vehicles to be sold did not absolve the parties of their contractual obligations. We next hold that Henry Day abandoned the Vehicle Contracts when it represented to Mr. Watkins that the dealership would not be getting any of the contracted-for vehicles and refunded his deposits. But there are insufficient factual findings to determine whether Mr. Watkins abandoned his rights under the Contracts and, in the event that he did not, whether he properly mitigated his damages. We therefore remand this matter for further factual findings on these issues.

## I. BECAUSE THE PARTIES UNDERSTOOD THAT THEY WERE CONTRACTING FOR THE PRODUCTION VERSION OF THE FORD GT40, THE LATENT AMBIGUITY IN THE VEHICLE CONTRACTS DOES NOT EXCUSE THE PARTIES' CONTRACTUAL OBLIGATIONS

¶24 Even though the Vehicle Contracts referred to the sale of the Ford GT40, the court of appeals held that they should be interpreted to embrace the sale of the Ford GTs that were actually delivered to Henry Day. Despite the Contracts' latent ambiguity, it reasoned that there was no question that the parties intended to contract for the sale and purchase of two Ford GTs—the moniker for the production version of the Ford GT40. Henry Day argues that "[g]iven the sophisticated business parties involved in the[] Contracts . . . the Contracts should be interpreted strictly on the[ir]

plain language." In contrast, Mr. Watkins argues that the parties used the term "GT40" to identify the vehicles he sought to purchase only "because that was its name at the time," and that "Henry Day knew and understood that the GTs it received were the same model that Ford . . . had initially introduced as the Ford GT40."

¶25 We begin with Henry Day's argument that the integration clause of the Vehicle Contracts prevents the consideration of extrinsic evidence regarding the alleged ambiguity. While we agree that the Contracts contain integration clauses,[1] the integration clauses do not necessarily bar the introduction of extrinsic evidence. *Tangren Family Trust v. Tangren*, 2008 UT 20, ¶ 11, 182 P.3d 326. Despite a finding that an "agreement is integrated, . . . parol evidence may be admitted . . . if . . . the language of the agreement is ambiguous." *Id.* (internal quotation marks omitted).

¶26 "When determining whether a contract is ambiguous, any relevant evidence must be considered" and "the better-reasoned approach is to consider the writing in light of the surrounding circumstances." *Ward v. Intermountain Farmers Ass'n*, 907 P.2d 264, 268 (Utah 1995). We allow the introduction of relevant evidence regarding the existence of a potential ambiguity to prevent an "inherently one-sided [analysis] . . . based solely on the extrinsic

---

[1] The Vehicle Contracts each contain an identical provision that states,

> [p]urchaser agrees that this contract includes all of the terms, conditions and warranties on both the face and reverse side hereof, that this agreement cancels and supercedes any prior agreement and as of the date hereof comprises the complete and exclusive statement of the terms of the agreement relating to the subject matter conveyed hereby.

"[W]e have explained that when parties have reduced to writing what appears to be a complete and certain agreement, it will be conclusively presumed, in the absence of fraud, that the writing contains the whole of the agreement between the parties." *Tangren Family Trust v. Tangren*, 2008 UT 20, ¶ 12, 182 P.3d 326 (internal quotation marks omitted). Because the language of the Vehicle Contracts states that it is "complete and exclusive" of other agreements and there is no assertion of fraud, the Contracts are integrated.

evidence of the judge's own linguistic education and experience." *Id.* (internal quotation marks omitted). In this way, we can interpret a contract and any potential ambiguity in light of the parties' intentions. *See WebBank v. Am. Gen. Annuity Serv. Corp.*, 2002 UT 88, ¶ 17, 54 P.3d 1139 ("The underlying purpose in construing or interpreting a contract is to ascertain the intentions of the parties to the contract.").

¶27 We first evaluate the contract for facial ambiguity. Facial ambiguity exists "if [a contractual term or provision] is capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies." *Id.* ¶ 20 (internal quotation marks omitted). The court of appeals held that there was no facial ambiguity in the Vehicle Contracts because "[w]hen the parties chose the term GT40, it was unambiguous and meant just that—the parties were contracting for the sale of what was then known as the GT40." *Watkins v. Ford*, 2010 UT App 243, ¶ 14, 239 P.3d 526. We agree.

¶28 But this does not end our inquiry. "Utah's rules of contract interpretation allow courts to consider *any relevant* evidence to determine whether a latent ambiguity exists in contract terms that otherwise appear to be [facially] unambiguous." *Gillmor v. Macey*, 2005 UT App 351, ¶ 35, 121 P.3d 57; *see also* 32A C.J.S. *Evidence* § 1514 (2013) ("Thus, a contract apparently unambiguous on its face may still contain a latent ambiguity that can only be exposed by extrinsic evidence."). While a "[facial] ambiguity arises solely from the terms of the instrument, . . . a latent ambiguity is one not appearing upon the face of the instrument, but is developed by extrinsic evidence." *Conlam v. Doull*, 9 P. 568, 569 (Utah Terr. 1886). A latent ambiguity "arises from a collateral matter when the document's terms are applied or executed." BLACK'S LAW DICTIONARY 93 (9th ed. 2009). By its very nature, a latent ambiguity is one that cannot be found within the four corners of the document but is only discoverable through the introduction of extrinsic evidence.[2]

---

[2] The introduction of "*any* relevant evidence," *Gillmor v. Macey*, 2005 UT App 351, ¶ 35, 121 P.3d 57, does not, however, allow a litigant to create ambiguity out of whole cloth or to advocate for an interpretation that is in no way supported by the language of the underlying contract. "[W]ords and phrases do not qualify as

(continued...)

¶29    The court of appeals reasoned that a latent ambiguity was "created by Ford's later decision to name the anticipated car the GT instead of the GT40" and it then assessed "evidence of surrounding circumstances . . . to determine what car the parties intended to buy and sell." *Watkins*, 2010 UT App 243, ¶¶ 14, 16.  We agree with the court of appeals' approach and its holding that the extrinsic evidence demonstrated the parties' intent to contract for the sale and purchase of "two of the cars that Ford announced and produced on the heels of the GT40 concept car that was unveiled at the 2002 auto show." *Id.*  Mr. Watkins testified that he went to Henry Day with the intent to purchase the production version of a concept car unveiled by Ford as the "GT40."   Both Mr. Watkins and Steve Kersey, Henry Day's fleet manager, used the term "GT40" to describe the car "because that was [the vehicle's] name at the time."  Mr. Kersey testified that when he created the Vehicle Contracts, "[he] understood that the automobiles that were the subject of [the Contracts were] the yet to be produced Ford GT concept car or the GT40 as it was called at that time."

¶30    At some point after the parties executed the Vehicle Contracts, Ford shortened the name of the production version of its concept car from "GT40" to "GT."  Henry Day argues that the names "GT40" and "GT" may refer to different vehicles.   But that proposition is simply not supported by the undisputed evidence. Jeremy Day, a co-owner and general manager of Henry Day, testified that "[t]he GT had earlier been introduced as the GT40." Thus, the testimony supports the conclusion that when the Vehicle Contracts were executed, both parties were in agreement regarding the particular car for which they were contracting—the production version (eventually designated the Ford "GT") of Ford's concept car, the "GT40."[3]  Because there is no dispute as to the identity of the

---

[2](...continued)
ambiguous simply because one party seeks to endow them with a different interpretation according to his or her own interests." *Saleh v. Farmers Ins. Exch.*, 2006 UT 20, ¶ 17, 133 P.3d 428.  Thus, "a finding of ambiguity after a review of relevant, extrinsic evidence is appropriate only when reasonably supported by the language of the contract." *Daines v. Vincent*, 2008 UT 51, ¶ 27, 190 P.3d 1269 (internal quotation marks omitted).

[3] Were we to accept Henry Day's argument, a party could use the
(continued...)

vehicles for which the parties contracted, the latent ambiguity created by Ford's subsequent name change does not excuse either party's obligations under the Vehicle Contracts.

## II. HENRY DAY'S CONDUCT DEMONSTRATED ITS ABANDONMENT OF THE VEHICLE CONTRACTS, BUT MR. WATKINS'S ACQUIESCENCE MAY NOT NECESSARILY CONSTITUTE A SIMILAR ABANDONMENT

¶31 Henry Day argues that abandonment involves either "the intentional relinquishment of one's rights in the contract," "acts or conduct of the parties inconsistent with the continued existence of the contract," or "mutual abandonment" of the contract through mutual assent of the parties. Henry Day then reasons that the parties abandoned the Vehicle Contracts because Henry Day returned Mr. Watkins's deposit, and Mr. Watkins deposited the refund check without objection.[4]

¶32 Mr. Watkins replies that waiver and abandonment of contract rights are substantially similar affirmative defenses and that both require the "intentional relinquishment of a known right." He asserts that Henry Day's December 31st letter unequivocally represented that the condition precedent to the Vehicle Contracts, the allocation of the contracted-for vehicles to Henry Day, had permanently failed. Mr. Watkins reasons that, because of the letter,

[3](...continued)
latent ambiguity caused by a name change as a sword to improperly excuse its performance under an otherwise unambiguous contract. For instance, assume that two parties had contracted for the purchase of a house located at 123 Main Street and that, at some point between execution of the contract and transfer of title, the city renamed the street State Street. Under Henry Day's reasoning, a party could use the latent ambiguity caused by the name change to escape its contractual obligations. Such an inequitable result is exactly what the doctrine of latent ambiguity is designed to address.

[4] Mr. Watkins argues that Henry Day waived the affirmative defense of "mutual abandonment." We disagree. Mr. Watkins concedes that Henry Day properly raised abandonment as an affirmative defense. And Henry Day repeatedly argued before the district court that both Henry Day and Mr. Watkins abandoned the Vehicle Contracts by acting inconsistently with them.

he did not know that he still had rights that he could assert under the Vehicle Contracts, and he therefore deposited the refund check without objection. Henry Day counters that its December 31st letter was accurate at the time it was written and Mr. Watkins understood there remained a possibility that Henry Day could receive an allocation of the vehicles if it won a future Allocation Award.

¶33    We set forth the rule governing abandonment of a contract in *Wallace v. Build, Inc.*, 402 P.2d 699 (Utah 1965). In *Wallace*, we held that a contract is abandoned when one party "show[s] by unequivocal acts that he regard[s] the agreement as abandoned," and the other party acquiesces. *Id.* at 701. Similarly, we have held that a contract may be abandoned by the parties' express assent or through "*acts or conduct* of the parties inconsistent with the continued existence of the contract." *Parduhn v. Bennett*, 2002 UT 93, ¶ 11, 61 P.3d 982 (internal quotation marks omitted); *see also Harris v. IES Assocs., Inc.*, 2003 UT App 112, ¶ 37, 69 P.3d 297. In the latter circumstance, assent to abandon a contract need not be express. *See Parduhn*, 2002 UT 93, ¶ 11. Rather, "*mutual assent* to abandon . . . a contract may be inferred from the attendant circumstances and conduct of the parties." *Id.* (internal quotation marks omitted). In all cases, abandonment must be "ascertained from all the facts and circumstances surrounding the transaction," and the "proof of abandonment must be made by clear, unequivocal, and decisive evidence."[5] 17B C.J.S. *Contracts* § 586 (2013).

---

[5] Mr. Watkins argues that the legal test for abandonment is set forth in *Timpanogos Highlands, Inc. v. Harper*, 544 P.2d 481 (Utah 1975). In *Timpanogos*, we held that a party may unilaterally abandon a contract through "intentional relinquishment of [its] rights in the contract." *Id.* at 484. Several subsequent Utah decisions have applied this rule. *See, e.g., Adair v. Bracken*, 745 P.2d 849, 851 (Utah Ct. App. 1987). While we characterized *Timpanogos* as an abandonment case, the "intentional relinquishment" language is actually the test for the related doctrine of waiver. Some eighteen years after *Timpanogos*, we decided *Soter's, Inc. v. Deseret Federal Savings & Loan Ass'n*, 857 P.2d 935 (Utah 1993). In *Soter's*, we clarified our waiver jurisprudence and held that "[a] waiver is the intentional relinquishment of a *known* right." *Id.* at 942 (emphasis added) (internal quotation marks omitted). The imprecise language in *Timpanogos* blurred the lines between our waiver and abandonment jurispru-

(continued...)

¶34 Henry Day and Mr. Watkins signed the two Vehicle Contracts on March 4, 2002. Mr. Watkins provided a $1,000 deposit as consideration for each Vehicle Contract. Mr. Watkins's consideration was essential to the formation of the Vehicle Contracts. *Res. Mgmt. Co. v. Weston Ranch & Livestock Co.*, 706 P.2d 1028, 1036 (Utah 1985) ("For a promise to be legally enforceable, it must be supported by consideration."). Mr. Watkins testified that he understood that the deposits were an essential part of the parties' agreement when they entered the Vehicle Contracts. He also testified that he believed Henry Day would not have signed the Vehicle Contracts without the deposits. Similarly, Mr. Kersey testified that the dealership would not have entered the Vehicle Contracts without a deposit.

¶35 Henry Day acted inconsistently with the continued existence of the Vehicle Contracts when it returned Mr. Watkins's deposit, which provided the consideration for the Vehicle Contracts. In December 2002, after holding Mr. Watkins's deposit for several months, Henry Day's general manager contacted a Ford representative to inquire whether Henry Day would be allocated any of the contracted-for vehicles. Ford indicated that, as a relatively small dealership, Henry Day would not receive any of the vehicles unless it won the President's Award or the Share of the Nation Award. After this conversation, Henry Day sent the December 31st letter to Mr. Watkins, which stated, "[e]nclosed please find a check for the refund of deposit on your vehicle order. We regret to inform you that our allocation is not going to allow us to receive this vehicle." Henry Day's general manager testified that he thought the refund of Mr. Watkins's deposit terminated the Vehicle Contracts. After considering this evidence, the district court correctly concluded that "[Henry Day's] return of [Mr. Watkins's] deposit represented conduct inconsistent with the continued existence of the [Vehicle Contracts]."

¶36 Mr. Watkins testified that when he received Henry Day's letter, he was "[d]isappointed, but not surprised[,] because from the outset [the parties] knew that there was the possibility that [Henry Day] wouldn't get any cars." He then testified that he deposited the

---

[5](...continued)
dence. Today we clarify that *Timpanogos* applied the waiver rule and, as such, is more properly characterized as a waiver case.

refund check because he "didn't know what else to do with it." Mr. Watkins testified that if the letter had indicated that Henry Day might still receive vehicles based on its receipt of an Allocation Award, "[he] would have gone down there and written them another check and asked them to keep it, [because he] was willing to wait to see if they got [any of the vehicles]." He therefore argues that, because of misinformation in Henry Day's December 31st letter, "he had no reason . . . to believe that Ford might nonetheless allocate one or more GT40s . . . to Henry Day" or that he still had contingent rights he could assert under the Vehicle Contracts.

¶37   At the time the parties entered the Vehicle Contracts, they both understood that the Contracts were contingent on Ford's allocation of vehicles to Henry Day. Indeed, Mr. Kersey and Mr. Watkins discussed that the President's Award played a role in Ford's allocation of vehicles. In December 2002, when Henry Day inquired with Ford regarding allocation of the vehicles, Ford confirmed that Henry Day would not be allocated any vehicles unless the dealership won the President's Award or the Share of the Nation Award. At that time, Henry Day had not received either Allocation Award in its forty year history. Based on this information, Henry Day decided to return Mr. Watkins's deposit and terminate the Vehicle Contracts. It then sent the December 31st letter, in which it informed Mr. Watkins that Henry Day would not be getting an allocation of vehicles.

¶38   The December 31st letter is ambiguous. It could have been interpreted as an unequivocal representation that the contingency had failed and Henry Day would never receive the contracted-for vehicles. Alternatively, it could have been interpreted as a representation that Henry Day would not receive any allocation of vehicles unless it did so pursuant to an Allocation Award that was yet to be made. Or, it could have been interpreted as a representation of Henry Day's *belief* that Ford would not allocate any vehicles to the dealership.

¶39   Mr. Watkins's actions in response to the letter can only be evaluated based on his understanding of what the letter meant in light of the information that he had at the time. But the district court did not make any factual findings in this regard. We therefore remand for a determination of Mr. Watkins's understanding of Henry Day's December 31st letter. If Mr. Watkins acquiesced in Henry Day's abandonment understanding that Henry Day could never receive any vehicles, Mr. Watkins's actions do not constitute

the intentional abandonment of his rights under the Contracts. *See McIrvin v. W. Side Unlimited Corp.*, No. 08-CV-127-LRR, 2010 WL 605651, at *13 (N.D. Iowa Feb. 18, 2010) ("Knowledge is an element of acquiescence: Acquiescence is where a person *knows* or *ought to know* that he is entitled to enforce his right or to impeach a transaction, and neglects to do so." (emphasis added) (internal quotation marks omitted)). If, however, Mr. Watkins acted with the knowledge that there remained a possibility that Henry Day could still potentially receive a vehicle through a future allocation award or, if he understood the letter merely as a statement of Henry Day's belief at the time, his deposit of the check and renewed search for another dealer would constitute acts or conduct inconsistent with the continued existence of the Vehicle Contracts. *See Parduhn*, 2002 UT 93, ¶ 11.

¶40 On remand, the appropriate analysis is analogous to that in a case of contract reformation. In such cases, "[i]f a mistake on the part of one of the parties to an agreement is caused by the other, it may entitle him or her to avoid the [reformed] contract." 17A C.J.S. *Contracts* § 183 (2013). Even "[a]n innocent misrepresentation on which one rightly relies may invalidate a contract [reformation] where it relates to a material matter." *Id.* § 199.

¶41 Were we to evaluate the question of the viability of Mr. Watkins's acquiescence as one of contract reformation, a unilateral mistake resulting from a misstatement by one contracting party would be sufficient to render the contract unenforceable. *See Briggs v. Liddell*, 699 P.2d 770, 772 (Utah 1985) ("[I]f one party is laboring under a mistake about a contract term and that mistake . . . has been induced by the other party[,] . . . then the inequitable nature of the other party's conduct will have the same operable effect as a mistake, and reformation is permissible."). If Mr. Watkins can prove that he reasonably understood Henry Day's letter as an unequivocal representation that the dealership would not ever receive an allotment of vehicles, Mr. Watkins would be entitled to rescind the reformation. *See Guardian State Bank v. Stangl*, 778 P.2d 1, 5 (Utah 1989) (Utah law accords with the "practically universal agreement that, if the material mistake of one party was caused by the other, either purposely or innocently, . . . the mistaken party has a right to rescission." (internal quotation marks omitted)).

### III. THE DISTRICT COURT'S FINDINGS OF FACTS ARE INSUFFICIENT TO DETERMINE WHETHER MR. WATKINS PROPERLY

MITIGATED HIS DAMAGES

¶42   In the event that the court on remand finds that Mr. Watkins did not abandon the Vehicle Contracts, it must then assess the issue of damages. "[U]nder the doctrine of avoidable consequences the nonbreaching party has an active duty to mitigate his damages, and he may not, either by action or inaction, aggravate the injury occasioned by the breach." *Mahmood v. Ross (In re Estate of Ross)*, 1999 UT 104, ¶ 31, 990 P.2d 933 (internal quotation marks omitted).

¶43   The court of appeals determined that the district court had made insufficient factual findings to conclude that Mr. Watkins failed to mitigate his damages. We agree. The district court made only a passing and conclusory reference to the issue of mitigation in its findings of fact. We are therefore unable to determine whether Mr. Watkins appropriately mitigated his damages.

**CONCLUSION**

¶44   The Vehicle Contracts contain a latent ambiguity created by Ford's decision to rename the production version of the "GT40" the "GT." This latent ambiguity, however, does not excuse the parties' obligations under the Contracts because the parties were in agreement regarding the identity of the cars to be bought and sold.

¶45   Parties abandon a contract when their conduct is inconsistent with the continued existence of the contract. Henry Day acted inconsistently with the continued existence of the Vehicle Contracts by refunding Mr. Watkins's deposit. While Mr. Watkins's actions were likewise inconsistent with the existence of the Contracts, we remand for a determination of his understanding of the December 31st letter at the time he took these actions. Finally, in the event the district court finds that Mr. Watkins's actions did not constitute abandonment of the Vehicle Contracts, it must then determine whether Mr. Watkins properly mitigated his damages.

¶46   Because we remand for further proceedings on the issues of Mr. Watkins's abandonment and mitigation of damages, we vacate the court of appeals' award of damages and attorney fees in favor of Mr. Watkins.