2010 UT App 201

HILLCREST INVESTMENT, a Utah partnership; Scandia Investment, LLC, a Utah limited liability company; Legacy Communities, LLC, a Utah limited liability company; Charles H. Horman, an individual; M. Gordon Johnson, an individual; Autumn Ridge Development, LLC, a Utah limited liability company; Alta Ridge Development, LLC, a Utah limited liability company; and all successors in interest to Bell Mountain Corporation, Plaintiffs and Appellants,

v.

SANDY CITY, A MUNICIPAL CORPORATION; and John Does 1–20, Defendants and Appellees.

No. 20090481–CA.

Court of Appeals of Utah.

July 22, 2010.

Denver C. Snuffer Jr., Steven R. Paul, and Daniel B. Garriott, Sandy, for Appellants.

George A. Hunt and Stephen T. Hester, Salt Lake City, for Appellees.

Before Judges ORME, THORNE, and VOROS.

## OPINION

THORNE, Judge:

¶ 1 Hillcrest Investment and other individuals and entities claiming to be successors in interest to Bell Mountain Corporation (collectively, Hillcrest) appeal from the district court's entry of judgment in favor of Sandy City (the City). We affirm.

## BACKGROUND

¶ 2 In 1970, the Horman family (the Hormans) purchased approximately 1000 acres of land (the Horman Properties) located in unincorporated Salt Lake County, Utah. The Hormans' intent was to develop the Horman Properties into a subdivision that would be annexed by the City. The anticipated name of the subdivision was Pepperwood, and the Horman Properties subsequently became known as the Pepperwood Subdivision or simply Pepperwood. The Hormans formed Bell Mountain Corporation (BMC) to act as the Pepperwood Subdivision's developer and apparently transferred ownership of the Horman Properties to BMC.

¶ 3 By 1974, two phases of the Pepperwood Subdivision had been recorded and the Hormans or BMC had conducted some well drilling and other water-related projects. Shortly after this initial work was done, the City passed an ordinance prohibiting any water company other than the City from making new water connections within the City. In response to the ordinance, the Hormans entered into an agreement whereby the City allowed the development of Pepperwood to continue in exchange for water rights owned by the Hormans. This agreement contemplated that the City's water system would be able to satisfy increasing health and fire requirements. But, by early 1975, the City's water system had proved inadequate to meet those growing needs and the City passed a moratorium on further development. Also in early 1975, the City adopted an ordinance providing that flood control fees be collected from developers in advance of construction.

¶ 4 In June 1975, BMC and the City entered into a contract (the Contract) whereby BMC agreed to finance, design, and construct a three-million-gallon underground reservoir and other water system improvements so that development of the Pepperwood Subdivision could go forward. The Contract provided not only for monetary payments to BMC but also provided for certain fee waivers for BMC and other entities. These fee waivers were detailed in Paragraph 12 of the Contract:

> In consideration of the above mentioned efforts and expenditures of [BMC], [the City] shall defer payment of all water connection fees and charges which would otherwise be made to [BMC] and Horman [P]roperties located east of 2000 east, north of 12000 south and south of 10000 south until such time as building permits are applied for by the individual owners of the lots contained therein and shall require payment from the said individual owners rather than [BMC] such fees as may be required shall be charged as provided by the then covenant fee resolution except that with relation to lots located in the 'RP Zone', neither [BMC] nor the owners of the said lots located in the Pepperwood Subdivision shall be required to pay 'flood control fees' as part of a connection fee and shall pay only one-half of the otherwise required 'park fee'.

At the time the Contract was executed, the RP Zone consisted of lots in Pepperwood Phases I, II, and III that had already been annexed into the City and zoned RP. The remainder of the Horman Properties then owned by BMC was either zoned A–1 Agricultural or had not yet been annexed by the City.

¶ 5 In 2005, after the City imposed flood control fees on Pepperwood Phase X and subsequent Pepperwood phases, Hillcrest sued the City, alleging various causes of action relating to the Contract. Hillcrest sought a refund of flood control fees paid to the City, other damages, and a court declaration that no further flood control fees would be charged to the remaining phases of Pepperwood. As the litigation progressed, it became apparent that Hillcrest's action pre-

sented two main issues: whether Hillcrest had standing to enforce the Contract, either as BMC's successor or assign or as a third-party beneficiary of the Contract; and whether Paragraph 12's waiver of flood control fees was intended to benefit only the lots in the RP Zone or, as Hillcrest alleged, *all* of the Horman Properties *except* those in the RP Zone. The City attempted to have the standing questions addressed preliminarily in a bifurcated proceeding, but the district court denied the City's motion to bifurcate and held a two-day bench trial on all issues in October 2008.

¶ 6 The district court entered its order and accompanying findings of fact and conclusions of law in January 2009. The district court found as a factual matter that Paragraph 12's flood control fee waiver was intended to benefit BMC and the RP Zone lot owners. However, rather than resolving the matter on the substantive meaning of Paragraph 12, the district court concluded that Hillcrest had no standing to enforce the Contract. The district court rejected Hillcrest's contention that BMC had assigned its interest in the Contract to Hillcrest prior to BMC's dissolution in 1993, concluded that a purported 2005 assignment from BMC to Hillcrest was not valid due to BMC's long-standing dissolution, and concluded that Hillcrest did not enjoy third-party beneficiary status as to the flood control fee waiver because that portion of the Contract was intended to benefit only BMC and the RP Zone lot owners pursuant to Paragraph 12. Due to its ruling on Hillcrest's lack of standing, the district court declined to address the other claims and arguments raised by the parties. On May 11, 2009, the district court entered its judgment and dismissed Hillcrest's action on the merits and with prejudice. Hillcrest appeals.

## ISSUES AND STANDARDS OF REVIEW

■■■ ¶ 7 Hillcrest raises various challenges to the district court's determination that it lacked standing to enforce the Contract. "Questions of contract interpretation which are confined to the language of the contract itself are questions of law, which we review for correctness." *Mellor v. Wasatch Crest Mut. Ins. Co.*, 2009 UT 5, ¶ 7, 201 P.3d 1004. "'If a contract is deemed ambiguous, and the trial court allows extrinsic evidence of intent, interpretation of the contract becomes a factual matter and our review is strictly limited.'" *Radman v. Flanders Corp.*, 2007 UT App 351, ¶ 5, 172 P.3d 668 (quoting *Nielsen v. Gold's Gym*, 2003 UT 37, ¶ 6, 78 P.3d 600). "[A] determination of standing is generally a question of law, which we review for correctness." *Mellor*, 2009 UT 5, ¶ 7, 201 P.3d 1004. However, notwithstanding these standards of review, we may affirm the judgment of the district court on alternate grounds apparent on the record. *See Bailey v. Bayles*, 2002 UT 58, ¶ 13, 52 P.3d 1158 (stating that an appellate court may affirm the judgment appealed from if it is sustainable on any legal ground or theory apparent on the record).

## ANALYSIS

■■ ¶ 8 Although the district court's stated reason for dismissal was Hillcrest's overall lack of standing to enforce the terms of the Contract, the district court's findings of fact and conclusions of law demonstrate that it substantively interpreted the Contract—and Paragraph 12 in particular—so as to preclude Hillcrest's claims for relief. Specifically, the district court ruled that the Contract's flood control fee waiver provision was intended to benefit only BMC and the RP Zone lot owners, implicitly concluding that the fee waiver applied *only* to land within the RP Zone. This ruling is inconsistent with Hillcrest's interpretation of Paragraph 12, which is that the phrase "the owners of the said lots located in the Pepperwood Subdivision" refers to the Horman Properties as a whole. To the extent that Hillcrest's appeal challenges this aspect of the district court's ruling, we affirm the district court's interpretation of the Contract and rely on that interpretation as an alternative ground upon which to sustain the district court's judgment of dismissal. *See generally Bailey*, 2002 UT 58, ¶ 13, 52 P.3d 1158.

¶ 9 In relevant part, Paragraph 12 states,

[The City] shall defer payment of all water connection fees and charges which would otherwise be made to [BMC] and Horman

[P]roperties ... except that with relation to lots located in the 'RP Zone', neither [BMC] nor the owners of the said lots located in the Pepperwood Subdivision shall be required to pay 'flood control fees' as part of a connection fee and shall pay only one-half of the otherwise required 'park fee'.

Thus, Paragraph 12 contains two distinct sets of benefits: the deferment of water connection fees and the waiver of flood control and park fees. The question before the district court was who was entitled to each of these benefits.

¶ 10 In the district court, Hillcrest argued that the phrase "except that with relation to lots located in the 'RP Zone'" identified properties that were *not* entitled to a deferment of water connection fees, leaving the final portion of Paragraph 12 as a stand-alone sentence: "[N]either [BMC] nor the owners of the said lots located in the Pepperwood Subdivision shall be required to pay 'flood control fees' as part of a connection fee and shall pay only one-half of the otherwise required 'park fee'." Under this interpretation, Hillcrest argued that it was entitled to a waiver of flood control fees for the later phases of the Pepperwood Subdivision, either as a successor or assign of BMC or as the owner of the remaining phases of the Pepperwood Subdivision.

¶ 11 By contrast, the City argued to the district court that the phrase "except that with relation to lots located in the 'RP Zone'" identified and limited the properties entitled to a flood control and park fee waiver, such that the only properties entitled to a fee waiver (regardless of ownership) were those located in the RP Zone. The district court, in response to the parties' disagreement on this issue in their summary judgment memoranda, ruled, "There is an ambiguity in [P]aragraph 12 of the [C]ontract requiring the Court to consider extrinsic evidence."[1]

¶ 12 At trial, the district court heard extrinsic evidence as to the meaning of Paragraph 12, including the testimony of former BMC officers Charles Horman, who had actually signed the Contract on behalf of BMC, and M. Gordon Johnson. Horman and Johnson both testified that Paragraph 12 was intended to waive flood control fees for all phases of Pepperwood, whether located within or without the RP Zone. Hillcrest also presented evidence that the City had not charged flood control fees on Phases IV through IX of Pepperwood's development. Since these phases involved land located outside of the RP Zone, Hillcrest argued that the City's failure to charge fees for these phases was evidence of the contracting parties' intent to waive fees for the entirety of the Pepperwood Subdivision.

¶ 13 In response, the City presented evidence that the first nine phases of Pepperwood were on land that the City had identified as requiring minimal flood control infrastructure due to favorable topography and that the City therefore only charged the fees for later phases that were anticipated to need more flood management. At the close of trial, the district court invited further briefing from the parties in lieu of closing arguments. Both parties submitted such briefing, but only the City's briefing addressed the issue of the meaning of Paragraph 12.

¶ 14 Thereafter, the district court entered its order finding that Paragraph 12's flood control fee waiver was intended to benefit BMC and the RP Zone lot owners. The order also concluded that the language "the owners of the said lots located in the Pepperwood Subdivision" meant "the RP Zone lot owners" and not, as Hillcrest argued, the Horman Properties or Pepperwood as a whole.[2] The district court further concluded that "the intended benefit conferred upon [the Horman Properties] was *not* for waiver of flood control fees" but, rather, was for the deferment of water connection fees. (Em-

---

**1.** Neither party challenges the district court's determination that Paragraph 12 was ambiguous.

**2.** The district court expressly noted that the question of whether "the RP Zone lot owners" in-

cludes the current owners of the RP Zone lots or only the owners at the time of the Contract was not before the court, and it did not address that issue.

phasis added.) Although the district court ultimately based its dismissal ruling only on Hillcrest's lack of standing, its limitation of "the said lots" to only those lots located within the RP Zone represents a clear, if implicit, adoption of the City's interpretation of Paragraph 12 over Hillcrest's interpretation.[3]

¶ 15 Hillcrest sought damages and injunctive relief relating only to flood control fees for Phases X and higher of the Pepperwood Subdivision, all of which are clearly outside of the RP Zone for purposes of Paragraph 12. Accordingly, the district court's acceptance of the City's position that Paragraph 12 waived such fees only *within* the RP Zone was fatal to Hillcrest's claims independent of Hillcrest's standing to enforce the Contract.

¶ 16 Hillcrest does not directly challenge the district court's interpretation of the substance of the Contract, but it does raise several issues relating to the district court's standing ruling that, if meritorious, would require reversal of the district court's interpretation of Paragraph 12. Hillcrest argues that the district court's third-party beneficiary determination was in error because Paragraph 12 intended that the flood control fee waiver benefit all of the Horman Properties, that the City's failure to impose flood control fees on the first nine phases of Pepperwood conclusively demonstrates that intent, and that the district court erred in failing to interpret the ambiguous language of Paragraph 12 against its drafter, the City.

¶ 17 "When ambiguity exists [in a contract], the intent of the parties becomes a question of fact." *WebBank v. American Gen. Annuity Serv. Corp.*, 2002 UT 88, ¶ 22, 54 P.3d 1139 (internal quotation marks omitted). "We review all findings of fact for clear error, granting the district court great deference in its review of the evidence." *Dansie*

*v. Hi–Country Estates Homeowners Ass'n,* 2004 UT App 149, ¶ 7, 92 P.3d 162; *see also Radman v. Flanders Corp.,* 2007 UT App 351, ¶ 5, 172 P.3d 668 ("'If a contract is deemed ambiguous, and the trial court allows extrinsic evidence of intent, interpretation of the contract becomes a factual matter and our review is strictly limited.'" (quoting *Nielsen v. Gold's Gym,* 2003 UT 37, ¶ 6, 78 P.3d 600)). Here, the district court properly considered extrinsic evidence, including evidence of "the parties' actions and performance," *see Dansie,* 2004 UT App 149, ¶ 14, 92 P.3d 162, and found that the contracting parties intended the flood control fee waiver to apply only to the RP Zone lot owners and not to Horman Properties as a whole. This interpretation is completely consistent with the plain language of Paragraph 12,[4] and Hillcrest has not demonstrated that the district court's factual findings concerning the contracting parties' intent were clearly erroneous.[5]

¶ 18 As to the City's decision not to impose flood control fees on the first nine phases of the Pepperwood Subdivision, the district court heard competing explanations for the City's actions and found as follows:

> [N]o fees were charged to [BMC] and later developers of the property, namely [Hillcrest], for the first nine phases of the development of the area based upon a map prepared by Salt Lake County ... which identified certain portions of the Horman property where it was anticipated that natural precipitation would be absorbed into the ground on site due to the sandy soil conditions and the relatively flat topography. The first nine phases of the Pepperwood Subdivision are located in that certain portion of property identified on the Salt Lake County map where the City anticipated that natural precipitation would be absorbed into the ground on site due to

---

3. To the extent that Hillcrest claims relief as a successor or assign of BMC, that relief would also be limited to lots in the RP Zone under the district court's interpretation of Paragraph 12.

4. Again, we are not reviewing the district court's ambiguity determination because that determination has not been challenged on appeal. Nevertheless, we note that the City's interpretation of Paragraph 12 is much more congruent with that

paragraph's plain language than is Hillcrest's interpretation.

5. Hillcrest has also failed to marshal the evidence in support of the district court's intent findings, a shortcoming that is itself fatal to Hillcrest's challenge to those findings. *See generally Dansie v. Hi–Country Estates Homeowners Ass'n,* 2004 UT App 149, ¶¶ 16–17, 92 P.3d 162.

the sandy soil conditions and the relatively flat topography. Therefore, minimal[ ] flood control infrastructure was required to be installed in the first nine phases. Thus, the district court found as a factual matter that the City did not impose flood control fees prior to Phase X because, as demonstrated by a map prepared by Salt Lake County, prior phases would require minimal flood control expenditures, rather than because of a waiver imposed by Paragraph 12. Again, Hillcrest has failed to demonstrate that the district court's factual findings in this regard are clearly erroneous. *See generally Dansie,* 2004 UT App 149, ¶ 7, 92 P.3d 162 ("We review all findings of fact for clear error. . . .").

■ ¶ 19 Finally, we reject Hillcrest's contention that the district court was required to resolve any ambiguity in Paragraph 12 against the City as the Contract's drafter. "Where there is ambiguity in a written document, the first order of business is to consider any extrinsic evidence which might resolve the ambiguity. *Only* if extrinsic evidence does not resolve the ambiguity is it appropriate to construe the document against its drafter." *General Sec. Indem. Co. v. Tipton,* 2007 UT App 109, ¶ 7, 158 P.3d 1121 (emphasis added) (citing *Wilburn v. Interstate Elec.,* 748 P.2d 582, 585 (Utah Ct.App.1988)). Here, the district court conducted a two-day bench trial, one key purpose of which was to adduce extrinsic evidence of the intent of Paragraph 12. After considering this extrin-

sic evidence, including the reasons for the City's failure to impose fees on Pepperwood Phases I through IX and both Hillcrest and the City's witnesses' testimony bearing on the meaning of Paragraph 12,[6] the district court made factual findings as to the parties' intent. As discussed above, Hillcrest has not adequately demonstrated that these findings are clearly erroneous. In light of its findings based on extrinsic evidence, the district court did not err in declining to adopt Hillcrest's interpretation of Paragraph 12 merely because the City drafted the Contract.

## CONCLUSION

¶ 20 The district court's findings of fact and conclusions of law essentially adopted a substantive interpretation of Paragraph 12 of the Contract that is inconsistent with Hillcrest's claims for relief. Specifically, the district court's ruling adopts an interpretation whereby flood control fees were waived only *within* the RP Zone, while Hillcrest's complaint seeks relief relating only to land *outside* of the RP Zone. Hillcrest raises several issues on appeal that challenge this ruling, but we have determined that Hillcrest's arguments lack merit. Accordingly, we affirm the district court's judgment of dismissal because, even if Hillcrest had standing to enforce the Contract generally, Hillcrest was not entitled to the relief it had requested under the district court's sound interpretation of the Contract.

---

**6.** In its reply brief, Hillcrest asserts that the City's own witness, Shane Pace, adopted Hillcrest's interpretation of Paragraph 12. This assertion mischaracterizes Pace's testimony. Upon first being asked about his interpretation of Paragraph 12, Pace indicated his belief that the flood control fee waiver was limited to the RP Zone. Pace was asked, "This reference to the Pepperwood Subdivision, is that a reference to the entire area or something less than the entire area?", to which Pace replied, "I believe it refers to something less than the entire area. I would say that that's because of the sentence just up above it." Hillcrest's counsel's exchange with Pace on the meaning of Paragraph 12 concluded,

 Q: Let's assume for a moment that that comma [in Paragraph 12] divides this long run on sentence into two, okay? And I want you to assume that because that comma cuts that clause off from what follows after that clause, tell me what the thought, "Neither [BMC] nor

the owners of the said lots located in Pepperwood subdivision shall be required to pay flood control fees as part of the connection fee and shall pay only one half of the otherwise required park fee." What does that thought mean to you?

 A: Well, it would be lot owners in the Pepperwood Subdivision wouldn't be required to pay the flood control fee and half the park fee.

 Q: So now we have to figure out what the Pepperwood area of the Pepperwood Subdivision referred to in 1976?

 A: Yes, *assuming you don't take the upper part of the paragraph.*

 Q: Okay, I'm willing to do that.

(Emphasis added.) Thus, Pace was agreeing to Hillcrest's interpretation of Paragraph 12 only to the extent that the final clause of that paragraph was to be considered in isolation—a proposition with which Pace clearly disagreed.

¶ 21 WE CONCUR: GREGORY K. ORME and J. FREDERIC VOROS JR., Judges.