**2015 UT App 281**

### THE UTAH COURT OF APPEALS

TECH CENTER 2000, LLC,
Plaintiff and Appellee,
*v.*
ZRII, LLC; AMALAKI, LLC; AND WILLIAM F. FARLEY,
Defendants and Appellants.

Opinion
No. 20130848-CA
Filed November 27, 2015

Third District Court, Salt Lake Department
The Honorable John Paul Kennedy
No. 090908334

James E. Magleby, Christine T. Greenwood, and
Bernard J. Nussbaum, Attorneys for Appellants

Florence M. Vincent and Spencer H. Reed, Attorneys
for Appellee

JUDGE STEPHEN L. ROTH authored this Opinion, in which
JUDGE J. FREDERIC VOROS JR. concurred. JUDGE GREGORY K.
ORME concurred in parts II, III, and IV, and dissented as to
parts I and V.

ROTH, Judge:

¶1     Zrii, LLC, (Zrii) appeals the district court's judgment in
favor of Tech Center 2000, LLC (Landlord). We affirm.

BACKGROUND

¶2     Zrii leased office space in a multi-building complex that
Landlord was developing. Eventually, Zrii occupied space in
two different buildings. In October 2008, Landlord and Zrii
entered into a lease (the Lease) for a third building that had yet
to be constructed (the Building). Zrii agreed to lease the Building

for three years beginning on April 1, 2009. Rent was set at approximately $21,000 per month for the first year, with the amount increasing to approximately $25,000 per month by the third year. In addition to providing a structural "shell" and utility access, Landlord agreed to construct leasehold essentials such as an elevator, restrooms, and lobby areas. Landlord also agreed to provide up to $40 per square foot, or $611,760, in additional "tenant improvement[s]" and customization (the tenant improvement allowance). Zrii was responsible for the cost of any further improvements or modifications to the Building. The Lease was personally guaranteed by William F. Farley, Zrii's CEO.

¶3    In February 2009, Zrii experienced a company-wide "walkout" of the majority of its distributors and employees. Shortly afterward, Zrii announced it would no longer be able to occupy the Building. Landlord filed suit against Zrii a few weeks later, asserting claims for breach of the Lease—principally unpaid rent—and enforcement of the personal guarantee. A bench trial was held and the district court ruled in favor of Landlord. The district court determined that Landlord was entitled to $795,871.04 in damages. It arrived at this number by first calculating the amount of rent due from the date of the breach until March 31, 2012—three years after the commencement of the Lease—and subtracting the amount Landlord received in mitigation from renting the Building to replacement tenants. The district court also noted that in an invoice to Zrii following the breach, Landlord had provided Zrii a monthly credit of $4,690.39. The district court found that the amount represented "an amortization of the tenant [improvement] allowance, for a total credit over the life of the lease," which the court calculated to be $168,854.04.[1] In the

---

1. While the district court did not explicitly state the time period over which the amortization had occurred, Zrii states that the $4,690.39 monthly credit can be arrived at by amortizing the

(continued…)

damages calculation, the district court also included late fees, interest, and realtor commissions. Finally, the court ruled that Farley's guarantee was enforceable under the circumstances.

¶4    Zrii filed a motion to amend the order, arguing that the district court erred in four respects: (1) by finding that Landlord had adequately mitigated its damages; (2) by giving Zrii credit against the unpaid rent for only the amortized amount of the tenant improvement allowance rather than the entire $611,760 provided in the Lease agreement; (3) by rejecting Zrii's impracticability and frustration of purpose defense despite the financially "devastating" company-wide "walkout" of Zrii's personnel and distributors; and (4) by determining that Farley was liable under the personal guarantee for damages from Zrii's breach of the lease agreement and for Landlord's attorney fees. After a hearing on the motion, the district court entered an amended order rejecting Zrii's contentions. Zrii appeals.

ISSUES AND STANDARDS OF REVIEW

¶5    Zrii first argues that the Lease was unenforceable because the tenant improvement allowance rendered the base rental rate indefinite, and that even if the Lease was enforceable, the district court erred in calculating damages because it did not give Zrii credit for the full tenant improvement allowance of $611,760. "'Questions of contract interpretation which are confined to the language of the contract itself are questions of law, which we review for correctness.'" *Hillcrest Inv. v. Sandy City*, 2010 UT App 201, ¶ 7, 238 P.3d 1067 (quoting *Mellor v. Wasatch Crest Mut. Ins. Co.*, 2009 UT 5, ¶ 7, 201 P.3d 1004). "If a contract is deemed ambiguous, and the trial court allows extrinsic evidence of

---

(…continued)
tenant improvement allowance over a twenty-five year period— a statement Landlord does not appear to contest.

intent, interpretation of the contract becomes a factual matter and our review is strictly limited." *Id.* (citation and internal quotation marks omitted). "[T]he adequacy of a damage award is a factual question" and "we will not reverse the trial court's findings unless they are clearly erroneous." *Lysenko v. Sawaya*, 2000 UT 58, ¶ 13, 7 P.3d 783 (citation and internal quotation marks omitted); *see also id.* ¶ 16; Utah R. Civ. P. 52(a) (providing that findings of fact "shall not be set aside unless clearly erroneous").

¶6      Second, Zrii argues that Landlord failed to adequately mitigate its damages. "[W]e review a trial court's conclusions as to the legal effect of a given set of found facts for correctness." *Watkins v. Ford*, 2010 UT App 243, ¶ 11, 239 P.3d 526 (alteration in original) (citation and internal quotation marks omitted), *aff'd*, *Watkins v. Ford*, 2013 UT 31, 304 P.3d 841.

¶7      Third, Zrii argues that the district court improperly rejected its impracticability and frustration of purpose defenses. "Whether impracticability affords a party relief from its obligations under a contract is a question of law that we review for correctness." *Central Utah Water Conservancy Dist. v. Upper E. Union Irrigation Co.*, 2013 UT 67, ¶ 27, 321 P.3d 1113.

¶8      Fourth, Zrii contends that the district court erred in determining that Farley's personal guarantee was enforceable. As we have stated above, "'Questions of contract interpretation which are confined to the language of the contract itself are questions of law, which we review for correctness.'" *Hillcrest*, 2010 UT App 201, ¶ 7 (quoting *Mellor*, 2009 UT 5, ¶ 7).

ANALYSIS

I. Claims Related to the Tenant Improvement Allowance

¶9      Zrii challenges two of the district court's determinations related to the tenant improvement allowance. Zrii first claims

that the tenant improvement allowance renders the Lease's rental provision too indefinite to be enforced. Zrii also argues that the district court erred in failing to credit the full tenant improvement allowance toward the damages Zrii owed to Landlord under the Lease. We address each claim in turn.

A.     Indefiniteness of the Lease

¶10    Zrii argues that the lease provision for a tenant improvement allowance rendered "the amount of the payable rent . . . too indefinite to be enforced." Zrii makes several arguments in connection with this contention. We are not persuaded.

¶11    First, Zrii contends that under the Lease, "the amount of payable Base Rent was directly dependent upon the Tenant Improvement Allowance." "When interpreting a contract, we first look at the plain language to determine the parties' meaning and intent." *Meadow Valley Contractors, Inc. v. Utah Dep't of Transp.*, 2011 UT 35, ¶ 64, 266 P.3d 671. "An agreement cannot be enforced if its terms are indefinite or demonstrate that there was no intent to contract." *Richard Barton Enters., Inc. v. Tsern*, 928 P.2d 368, 373 (Utah 1996). Here, Article 3 of the Lease, titled "Rent, Operating Expenses," clearly set forth the amount of "Monthly Base Rent" due each month to Landlord. The tenant improvement allowance, on the other hand, was provided for in the Lease under Article 2, titled "Term, Commencement, Tenant Improvements." The Lease contains no language connecting the amount of rent Zrii was obligated to pay under the Lease with the amount Landlord agreed to pay for additional improvements to the Building. Rather, the plain language and organization of the Lease demonstrate that the tenant improvement allowance was a separate element of the contract between the parties and not, as Zrii contends, connected to the Lease's rental rate. Simply put, Article 3 specifically describes Zrii's monthly rental obligation for each year of the three-year lease, while Article 2 describes Landlord's obligation to provide a specified tenant

improvement allowance. Zrii has not otherwise shown that the two obligations are tied to each other in any way, much less that the monthly lease payments are dependent on the amount ultimately expended for tenant improvements. Accordingly, there is no indefiniteness in the rent provision of the Lease itself that would make it unenforceable.

¶12    Zrii's remaining arguments are somewhat amorphous, but all seem to rely on the theory that the Lease provided for a deduction of the tenant improvement allowance from Zrii's rental obligations.[2] Having already concluded that the Lease itself unambiguously provided for no such deduction, resolution of Zrii's remaining claims hinges on determining, as Zrii appears to contend, whether the parties modified the Lease after the breach in a way that linked the tenant improvement allowance to the amount of rent due. In support of its arguments, Zrii points us to an invoice and accompanying correspondence that Landlord sent during the post-breach negotiations in which Landlord applied a monthly credit of $4,690.39, purportedly based on amortization of the then-unspent tenant improvement allowance. In a letter sent a few weeks later, Landlord stated, "In accordance with Lease terms, the Landlord amortized and deducted the Tenant Improvement allowance of $611,760.00 (i.e., $4,690.39/month) from the Tenant's rent." Zrii does not persuade us that Landlord's post-breach credit for the tenant

_____

2. For example, Zrii contends that the Lease was only the "starting point" in determining the rent to be paid and that the tenant improvement allowance should have been deducted from the rent. Zrii also argues that the amount that would be spent on tenant improvements was indefinite "until the very end," thus rendering the amount of rent due indefinite. Zrii, however, argues that while the amount of tenant improvements was indefinite, the amount would have been at least the $611,760 provided in the Lease and so the full amount of the allowance should have been deducted from its rental obligations.

improvement allowance amounted to a modification of the Lease's unambiguous terms.

¶13 "[P]arties to a contract may, by mutual consent, modify any or all of a contract." *Harris v. IES Assocs., Inc.*, 2003 UT App 112, ¶ 46, 69 P.3d 297 (alteration in original) (citation and internal quotation marks omitted). "A valid modification of a contract or lease requires a meeting of the minds of the parties, which must be spelled out, either expressly or impliedly, with sufficient definiteness." *Richard Barton Enters.*, 928 P.2d at 373 (citation and internal quotation marks omitted). The party claiming the modification bears the burden of showing that a meeting of the minds occurred. *Id.*

¶14 Zrii has not met that burden here. As in *Harris*, the statement that Zrii points us to was not "accompanied by terms and conditions" as was the "signed initial contract," nor was it "titled as an addendum or modification" or signed by both parties. *See Harris*, 2003 UT App 112, ¶ 47. Indeed, the line-item invoice containing a monthly credit to which Zrii directs us is similar in nature to the "list of equipment with price estimates" the court in *Harris* determined was not a valid contract modification. *See id.* And in our view, the statement by Landlord that the tenant improvement allowance was deducted and amortized "accord[ing to] the Lease terms" is, at best, a generous misinterpretation of the Lease in the context of Zrii's breach, not a valid agreement to modify its terms. Indeed, Zrii itself concedes that, in connection with its argument that the district court should have credited it with the full amount of the allowance rather than accepting Landlord's lower amortization calculation, "there was no meeting of the minds as to amortization of the Tenant Improvement Allowance." Essentially Zrii appears to argue that the Lease was modified by the Landlord's invoice and letter in a way that provides Zrii the benefit of a deduction from the rental amount of the tenant improvement allowance, but not at the amortized rate specified in the very statement providing that deduction. Neither the

language of the Lease nor the post-breach dealings of the parties support this position.[3]

¶15    Accordingly, we conclude that the district court did not err in determining that the Lease was enforceable on its terms.

B.    Calculation of Damages

¶16    Zrii next argues that even if the Lease was enforceable as written, the district court should have deducted the full tenant improvement allowance from any damages Zrii owed to Landlord.

¶17    When one party breaches a contract, the injured party is entitled to recover damages

> as measured by (a) the loss in the value to him of the other party's performance caused by its failure or deficiency, plus (b) any other loss, including incidental or consequential loss, caused by the breach, less (c) any cost or other loss that he has avoided by not having to perform.

---

3. To the extent Zrii may be asserting that the invoice and letter amounted to an interpretation of the Lease that linked the rent with the tenant improvement allowance, that argument is no more persuasive. We have already determined that the Lease's plain meaning does not encompass such a link, and Zrii has not demonstrated that Landlord's post-breach conduct is legally sufficient to warrant an interpretation of the Lease that diverges from its unambiguous language. *See Flores v. Earnshaw*, 2009 UT App 90, ¶ 13, 209 P.3d 428 ("[A]dmission of parol evidence to determine intent is allowed only if there is a finding of facial ambiguity; otherwise, the parties' intentions must be determined solely from the language of the contract.") (citation and internal quotation marks omitted).

Restatement (Second) of Contracts § 347 (1981); *accord TruGreen Cos., L.L.C. v. Mower Bros., Inc.*, 2008 UT 81, ¶ 10, 199 P.3d 929. Zrii contends that its breach saved Landlord from having to expend the $611,760 that the Lease obligated Landlord to provide in tenant improvements and therefore the full tenant improvement allowance should have been credited as an offset against the amount of rent Zrii owed. Landlord responds that the district court was correct in determining that the contemplated improvements amounted to simply "capital expenditures" that would have provided Landlord value far beyond the life of the three-year lease with Zrii. We agree.

¶18 The Building itself was essentially a hollow shell with concrete floors; the tenant improvements contemplated by the Lease were necessary to provide a useable space for a tenant to conduct its business. In part because Zrii was to be the first occupant of the space, Landlord agreed to provide a specified tenant improvement allowance for basic needs, including flooring, paint, and individual offices. These were expenses that Landlord would have had to expend regardless of which tenant it had contracted with for construction of the Building; and the improvements would be Landlord's property once the Lease's term ended, resulting in an improved building that could be offered to prospective future tenants. Landlord's offer to cover the cost of these basic improvements appears to be essentially a guarantee that Landlord would be providing Zrii leased space that contained the basic infrastructure needed to conduct business. Thus, Landlord did not "save" these expenses as a result of Zrii's breach. And after Zrii's breach Landlord was still left with the expense of improving the space in order to rent the Building to replacement tenants.[4] Accordingly, we find no error in the district court's determination that it was "not appropriate

---

4. Landlord claims it had to expend nearly $280,000 to construct tenant improvements needed to rent out just a portion of the space left vacant by Zrii's breach.

to view the maximum amount of proposed tenant improvements as simply an expense that was saved by [Landlord] upon Zrii's breach" and in declining to credit the entirety of the tenant improvement allowance against the damages Zrii owed.[5]

¶19   Zrii correctly points out that the district court offset the damages award to Landlord by $168,854—an amount the district court calculated based on a monthly credit Landlord offered to Zrii in an invoice following Zrii's breach and that the district court found "represent[ed] an amortization of the tenant [improvement] allowance." Zrii appears to argue that this offset is evidence that the district court agreed that the tenant improvement allowance should have been credited against the damages Zrii owed. Zrii's position therefore seems to be that once the district court decided that Zrii was entitled to some offset against the rent based on the tenant improvement allowance, there was no basis for the court to then credit an amount less than the total allowance by simply accepting Landlord's twenty-five year amortization calculation.

¶20   Zrii seems to misunderstand the basis for the district court's decision. There is no indication, as Zrii contends, that the district court provided the $168,854 credit because it had concluded that the Lease or any post-Lease negotiations entitled Zrii to have any or all of the tenant improvement allowance credited against the damages resulting from Zrii's breach. Instead, it is clear from the district court's express finding that "[Landlord] was not required under the Lease Agreement to

---

5. We note that Landlord may have saved *some* expenses because of Zrii's breach. However, both below and on appeal, Zrii has taken an all-or-nothing approach and claimed that Landlord was spared the expense of the entire tenant improvement allowance—a claim we have already explained the district court correctly rejected. And Zrii has not provided evidence supporting a credit of any other amount.

provide this credit to Zrii" and that the district court merely applied the credit in recognition of the fact that Landlord had voluntarily provided Zrii with such an offset during post-breach negotiations. The district court seemed to treat this credit as a sort of concession on the part of Landlord that the court itself was willing to put into effect in the judgment, rather than as an obligation that the court determined Landlord was required to provide. Landlord has not appealed the district court's decision in this regard, and Zrii has thus benefited in the amount of $168,854, which it might not otherwise have been entitled to under the Lease alone. Accordingly, we conclude that Zrii has not shown that the district court erred in determining the amount of the tenant improvement allowance credit incorporated in the court's damages calculation.

## II. Mitigation of Damages

¶21 Zrii contends that Landlord failed to mitigate damages caused by Zrii's breach when it allowed a pending sale of the property to fall through. Landlord urges us to affirm the district court's finding that Landlord adequately mitigated its damages through other means. We agree with Landlord, and conclude that it was not required to sell the property, but rather was required only to make reasonable efforts to relet the property.

¶22 In *Reid v. Mutual of Omaha Insurance Co.*, 776 P.2d 896 (Utah 1989), our supreme court held that, "[A] landlord who seeks to hold a breaching tenant liable for unpaid rents has an obligation to take commercially reasonable steps to mitigate its losses, which ordinarily means that the landlord must seek to relet the premises." *Id.* at 906. The court went on to say,

> A further word about the standard by which a landlord's efforts to mitigate are to be measured: the standard is one of objective commercial reasonableness. A landlord is obligated to take such steps as would be expected of a reasonable

landlord letting out a similar property in the same market conditions.

*Id.* at 906–07 (citations omitted). And "the objective commercial reasonableness of mitigation efforts is a fact question that depends heavily on the particularities of the property and the relevant market at the pertinent point in time." *Id.* at 907 (citations omitted).

¶23 Here, the district court determined that Landlord "reasonably and adequately mitigated its damages by attempting to relet the premises, by working with Zrii to allow them to sublet the premises, and by attempting to sell the premises after Zrii breached its obligations." The court made this determination based on its findings that both Landlord and "Zrii worked with listing agents and brokers to sublease or relet" the Building; that by April 1, 2012, Landlord had been able to relet sixty-one percent of the Building; that Landlord's property management arm moved into the Building with a corresponding offset to Zrii's rental obligation; and that Landlord had attempted to sell the Building, but that it was never sold. The court also specifically found that Landlord's failure "to close on a potential sale does not negate the Court's finding of commercial reasonableness in light of the other mitigation efforts pursued by [Landlord]."

¶24 Zrii contends, however, that Landlord's abandonment of a potential sale constitutes a failure to mitigate damages. In January 2010, Landlord accepted an offer from a real estate company to sell the Building for $3.245 million. However, by March 2010, Landlord had abandoned the sale and returned the earnest money. When asked under oath about why the sale had failed, Landlord's representative stated, "We let it drop. It expired and that was it." Zrii contends that this failure to pursue the sale violates principles regarding mitigation established in *Mahmood v. Ross*, 1999 UT 104, 990 P.2d 933.

¶25　*Mahmood* involved a loan taken out by three partners that was secured by real property owned by one of them. *Id.* ¶¶ 3–4. The loan went into default after two of the partners failed to fulfill their obligations; the lender then foreclosed and sold the third partner's property at a trustee's sale. *Id.* ¶¶ 5, 9–11. The third partner brought suit against one of the two defaulting partners claiming that the default had caused him to lose his property. *Id.* ¶¶ 9–11. The supreme court disagreed, concluding that, because the third partner had refused an intervening offer to purchase one half of the property for an amount sufficient to have paid off the lender, he had "failed to mitigate his damages." *Id.* ¶ 37. Zrii asserts that the district court erred in not coming to a similar conclusion here.

¶26　However, we conclude that *Mahmood* is distinguishable from the circumstances here. In *Mahmood*, the court determined that mitigation principles required the owner to accept an offer to sell his property where that property was going to be sold against his will at a trustee's sale anyway. Here, however, external circumstances did not require sale of the property; rather, Landlord built the property for the purpose of leasing it out to produce rental income or even to sell it under favorable circumstances. While sale of the property in this case could have fully mitigated Landlord's damages from Zrii's breach of the Lease, Zrii has not presented any authority that suggests that a landowner currently in the business of leasing its property is required to sell that property in order to maximize mitigation, even if that landowner might be willing to sell its property as a general matter. Rather, "the standard is one of objective commercial reasonableness." *Reid*, 776 P.2d at 906. And even assuming that Landlord had entered into a sale-purchase agreement that might have been specifically enforceable in the face of the buyer's unwillingness to proceed with the purchase, Zrii presented no evidence to show that it was commercially reasonable to pursue the sale through a lawsuit or that selling the property was more commercially reasonable for "a reasonable landlord letting out a similar property in the same

market conditions" than continuing to lease it in the ordinary course of its commercial leasing business. *See id.* at 907. Rather, commercial reasonableness would seem to allow a property owner faced with a tenant's default to choose, based on the owner's assessment of benefits and risks, whether to relet the property or to sell it, even if either option might be reasonable.

¶27 Moreover, the principle of mitigation is meant to temper the harm flowing from a wrong by encouraging an injured party to take reasonable steps to reduce the impact of the other party's breach. *See* Restatement (Second) of Contracts § 350 (1981); *accord Utah Farm Prod. Credit Ass'n v. Cox*, 627 P.2d 62, 64 (Utah 1981). To require a landlord to maximize mitigation beyond reasonable efforts to relet the premises would thwart this ameliorating purpose by subordinating the injured party's broader business interests to the needs of the defaulting party. We think this imposes an additional and unjustified burden on a landlord. Thus, we conclude that a landlord who chooses to meet his or her mitigation responsibility by reletting the premises must "take such steps as would be expected of a reasonable landlord letting out a similar property in the same market conditions." *Reid*, 776 P.2d at 907.

¶28 The district court found that Landlord had taken such steps in this case, and Zrii does not challenge that finding. Accordingly, we conclude that the district court did not err in determining that Landlord had adequately mitigated its damages. Landlord was not required to pursue the offered sale of the Building, and we see no error in the district court's factual determinations that led to its conclusion that Landlord had taken commercially reasonable steps to relet.

### III. Impracticability and Frustration of Purpose

¶29 Zrii next argues that the district court improperly rejected its defenses of impracticability and frustration of purpose. We

conclude that under the circumstances of this case Zrii was not entitled to avail itself of either defense.

A.    Impracticability

¶30    "The impracticability principle is generally identified in case law as the contractual defense of impossibility." *Kilgore Pavement Maint., LLC v. West Jordan City*, 2011 UT App 165, ¶ 9, 257 P.3d 460 (citations omitted). "Under the contractual defense of impossibility, an obligation is deemed discharged if an unforeseen event occurs after formation of the contract and without fault of the obligated party, which event makes performance of the obligation impossible or highly impracticable." *Id.* (citation and internal quotation marks omitted). Zrii contends that the company-wide walkout it experienced occurred "without warning" and rendered it unable to pay rent and occupy the Building because "[m]onthly sales dropped almost 80%" and "Zrii was never profitable again."

¶31    The walkout may indeed have made it impossible for Zrii to follow through on its obligation to Landlord. However, "a party may not defend on grounds of impracticability when that party takes on the risk that a supervening event will occur and render performance impracticable or impossible." *Central Utah Water Conservancy Dist. v. Upper E. Union Irrigation Co.*, 2013 UT 67, ¶ 28, 321 P.3d 1113. We conclude that internal disputes within a company, as well as the potential for a decline in a company's monthly profits or sales, are the type of normal risks and supervening events inherent in operating a business. As between two contracting parties, it is not reasonable to expect that a landlord will bear the risk of the tenant's business reversals, especially those originating from conflict within the business itself, at least in the absence of an agreement to do so. Thus, the walkout was the type of supervening event for which Zrii bore the risk under the Lease. *See id.* Accordingly, we conclude that the defense of impracticability is not available to Zrii under these circumstances.

B.      Frustration of purpose

¶32    "Frustration of purpose differs from the defense of impossibility only in that performance of the promise, rather than being impossible or impracticable, is instead pointless." *Western Props. v. Southern Utah Aviation, Inc.*, 776 P.2d 656, 659 (Utah Ct. App. 1989). "The applicability of this doctrine depends on the total or nearly total destruction of the purpose for which, in the contemplation of both parties, the transaction was made." *Castagno v. Church*, 552 P.2d 1282, 1283 (Utah 1976). "Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged . . . ." Restatement (Second) of Contracts § 265 (1981).

¶33    Zrii contends that "the underlying assumption was that Zrii would be able to continue conducting its business in the normal course (subject, of course, to economic conditions), for which it needed more space" and an "unforeseen 'crippling blow' obliterated that assumption." The "crippling blow" to which Zrii refers was the company-wide walkout. This was not an "event the non-occurrence of which was a basic assumption on which the contract was made." *See id.* While the walkout may have made Zrii financially unstable, it did not obliterate "the purpose for which . . . the transaction was made"—to provide Zrii space to operate its business and to fulfill Landlord's need for a tenant. *See Castagno*, 552 P.2d at 1283. And while the walkout may have made honoring its obligation under the Lease more difficult, it did not render the Lease "pointless." *See Western Props.*, 776 P.2d at 659. Accordingly, we conclude that the frustration of purpose defense is also not available to Zrii.

## IV. Personal Guarantee

¶34    Zrii's final argument is that the district court erred in determining the personal guarantee signed by Farley was enforceable. We affirm the district court's ruling.

¶35    As part of the Lease, Farley signed a "Personal Guarantee of Lease" (the Guarantee) wherein he "unconditionally guarantee[d] the full performance of each and all of the terms, covenants, and conditions" of the Lease, "including the payment of all rentals, liens against the building, and other charges to accrue thereunder." The Guarantee was to "continue in favor of Landlord for the period notwithstanding any extension, modification or alteration" of the Lease.

¶36    Zrii focuses on the phrase "shall continue in favor of Landlord for the period" and argues that once the three-year term under the Lease ended, "so[] did the Guarantee." Here, Landlord filed suit in May 2009, just one month after the Lease period was to begin in April 2009. So while it is not explicitly stated, Zrii appears to be arguing that Farley cannot be held liable under the Guarantee for the judgment entered against Zrii because it was not entered until January 2013, well after the April 2012 date Zrii contends the Guarantee expired. But because Landlord's original claim was brought well within the relevant time period, and because we agree with Landlord that Zrii has "cite[d] no authority to indicate that if a guaranty 'expires' *after* a suit has been brought to enforce that guaranty, . . . the guarantor somehow escapes liability," we conclude that the Guarantee was enforceable against Farley.

## V. Attorney Fees

¶37    Landlord requests an award of its attorney fees on appeal. "[W]hen a party who received attorney fees below prevails on appeal, the party is also entitled to fees reasonably incurred on appeal." *Valcarce v. Fitzgerald*, 961 P.2d 305, 319 (Utah 1998) (internal citation and quotation marks omitted). Because

Landlord was awarded attorney fees below and has successfully prevailed on appeal, we grant its request. We therefore remand to the district court for a determination of what reasonable attorney fees were incurred by Landlord on appeal.[6]

## CONCLUSION

¶38    The district court did not err in determining that the Lease was enforceable and that Zrii was not entitled to have the full amount of the tenant improvement allowance credited against the damages awarded to Landlord. Nor did the district court err in determining that Landlord adequately mitigated its damages, rejecting Zrii's impracticability and frustration of purpose defenses, and enforcing Farley's obligations under the Guarantee. We grant Landlord's request for attorney fees on appeal, and remand for further proceedings on that issue.

¶39    Affirmed.

––––––––––––

6. Zrii takes issue with a conclusion in the district court's ruling that under the Guarantee "Farley agreed to pay [Landlord's] reasonable attorney's fees . . . regardless of whether [Landlord] prevails" and asks us to "clarify that [the court's] 'winner pays' conclusion is not law." We need not determine whether the court mischaracterized the attorney fee provision of the Guarantee because, as the district court noted, "[w]hether Farley would be liable for these amounts if [Landlord] did not prevail is moot because [Landlord] did prevail."