2018 UT App 133

## THE UTAH COURT OF APPEALS

RICHARD HARDY,
Appellant,

*v.*

JEREMY MONTGOMERY AND JULIE MONTGOMERY,
Appellees.

Opinion
No. 20160148-CA
Filed June 28, 2018

Seventh District Court, Price Department
The Honorable George M. Harmond
No. 140700039

Tyler A. Woodworth, Attorney for Appellant

Shane Clifford, Attorney for Appellees

JUDGE MICHELE M. CHRISTIANSEN authored this Opinion, in
which JUDGES GREGORY K. ORME and RYAN M. HARRIS concurred.

CHRISTIANSEN, Judge:

¶1    Richard Hardy appeals from the trial court's order
awarding judgment in favor of Jeremy Montgomery and Julie
Montgomery (collectively, the Montgomerys). We affirm in part,
vacate in part, and remand for further proceedings.

BACKGROUND

¶2    Hardy owned a home in Helper, Utah. In late 2012 or
early 2013, Hardy listed the home for sale with Bridge Realty.
Before the home sold, Hardy met the Montgomerys, who were
interested in buying the home. Hardy wanted to sell his home to
the Montgomerys, but he did not want to pay a real estate
commission to Bridge Realty. To avoid paying the commission,

the parties agreed that the Montgomerys would lease the home from Hardy with an option to purchase the home after Hardy's listing agreement with Bridge Realty expired. Hardy retained an attorney, who drafted a lease agreement (the Lease Agreement). Attached to the Lease Agreement was a real estate purchase contract (the REPC) and a seller financing addendum. The Lease Agreement provided that the Montgomerys would pay $700 in rent plus $100 in "additional rent" to reimburse Hardy for property taxes and insurance. The Lease Agreement contained a "Non-Waiver" provision, which stated in part, "No failure of Landlord to enforce any term hereof shall be deemed a waiver, nor shall any acceptance of a partial payment of rent be deemed a waiver of Landlord's right to the full amount thereof." Most relevant here, the Lease Agreement contained an "Option to Purchase" provision, which stated:

> Provided Tenant is not in default hereunder, Tenant shall have the right to purchase ("Option") the Premises for the Purchase Price of $126,775.00, ("Purchase Price") at any time after September 15, 2013 and before the end of the Term of the Lease. As consideration for the Option, Tenant shall pay Landlord, a non-refundable option payment of $7,000.00 ("Option Payment"), payable on or before the beginning of the Term, which shall be applied to the Purchase Price and shall be counted toward the Earnest Money Deposit. In the event the Tenant exercises the Option to purchase the Premises, Tenant shall execute a Promissory Note for the balance remaining on the Purchase Price, after the Option Payment has been applied, and the parties shall close the transaction, as outlined in [the REPC], attached hereto as Exhibit "A", together with its applicable amendments, and addenda.

The REPC stated that the $7,000 was an earnest money deposit and that Hardy, as the seller, would provide financing for the remaining balance of the purchase price.

¶3    The parties signed the Lease Agreement on April 17, 2013. The parties did not sign the REPC at that time. Hardy declined to sign the REPC because he allegedly had an "uneasy feeling" about selling the home to the Montgomerys. Nevertheless, the Montgomerys delivered a $7,000 check to Hardy as consideration for the option to purchase the home. Pursuant to the terms of the REPC, Hardy was required to "deposit the Earnest Money into [a] Brokerage Real Estate Trust Account" within four days of receipt. Instead, Hardy deposited the $7,000 into his personal checking account.

¶4    The Montgomerys paid $700 per month in rent from May 2013 to October 2013; the Montgomerys never paid the $100 in additional rent for property taxes and insurance. Hardy never mentioned the Montgomerys' failure to pay the $100 in additional rent nor advised them that this amounted to a default of the Lease Agreement.

¶5    In July 2013, Hardy and Jeremy Montgomery spoke on the phone, and Hardy indicated that he no longer wished to sell the house to the Montgomerys. Thereafter, in September 2013, Hardy's attorney sent a letter to the Montgomerys. The letter stated, in relevant part, that the Montgomerys still had "the ability to exercise [the] option to purchase the residence," but that Hardy was "not interested in financing the purchase of the property" based on the Montgomerys' late rent payments in May, June, and July 2013. The letter claimed that Hardy had no obligation to finance the purchase of the property because the REPC was "never executed or signed" and because the Lease Agreement provided that "the entire agreement is contained in the lease agreement and any additional agreement must be

signed by all of the parties." The letter also alerted the Montgomerys that they were in default based on their late rent payments and stated that it gave Hardy "the option to terminate the entire agreement at his discretion if [the Montgomerys] fail[ed] to remedy the breach of contract by paying all associated late fees and damages within 7 days of this notice." The letter did not mention the fact that the Montgomerys had not been paying the full amount—$800—in rent and additional rent. The Montgomerys stopped paying rent in October 2013 but stayed in the home until the second week of February 2014.

¶6     Hardy sued the Montgomerys in May 2014, alleging breach of contract, unjust enrichment, conversion, and breach of the implied covenant of good faith and fair dealing. More specifically, Hardy claimed that the Montgomerys (1) violated the terms of the Lease Agreement and that the REPC and Seller Financing Addendum "should be ignored"; (2) owed rent in the total amount of $800 per month, not $700 per month; (3) owed late fees and liquidated damages; (4) owed Hardy damages for the sale opportunities Hardy had to forgo from May 2013 through March 2014 because of the Montgomerys' occupancy and claimed rights; and (5) owed Hardy damages for missing personal property.

¶7     The Montgomerys filed an answer and counterclaim, alleging that (1) the REPC was incorporated into, and was a part of, the Lease Agreement; (2) Hardy anticipatorily repudiated the option provision in the Lease Agreement; (3) Hardy was unjustly enriched based on his anticipatory repudiation, and the $7,000 Hardy received should be offset against anything the Montgomerys owed Hardy; (4) Hardy provided no evidence of any lost sales opportunities for the home; and (5) Hardy provided no evidence regarding alleged damages to his personal property.

¶8     The trial court held a bench trial on October 2, 2015. In its written findings of fact and conclusions of law, the trial court determined that the Lease Agreement "clearly integrates the REPC and seller financing addendum into the Lease and the REPC is dated the same date as the Lease." Regarding waiver, the court determined that "Hardy never told the Montgomerys that the rental payment was in the wrong amount" and that the September 2013 letter from Hardy's attorney did not demand the additional $100 per month "even though the letter details other amounts owing and references several provisions of the Lease." Thus, the court determined, "Hardy intentionally waived the right to collect the additional $100.00 each month in rent." The court further determined that the Montgomerys' June and October rent payments had been late. Applying the Lease Agreement's late-fee and liquidated-damages provision, the court determined that the Montgomerys owed $140 in late fees and $2,420 in liquidated damages. The court rejected Hardy's claim that he had lost potential sales of the home, finding that Hardy was "merely speculating that he may have been able to sell the house." The court also rejected Hardy's claims that "the Montgomerys kept or lost certain items of personal property [Hardy] left in the house."

¶9     The court further determined that Hardy had anticipatorily repudiated the option agreement and that the Montgomerys had the right to cure their default and exercise the option. More specifically, the court determined that Hardy's refusal to sign the REPC, while "not amounting to an anticipatory repudiation at that point, . . . clearly indicated Hardy was having second thoughts about financing the property." The court observed that in his July 2013 phone call with Jeremy Montgomery, Hardy had "confirmed he would not sell the property to [the] Montgomerys." The court also observed that in his September 2013 letter, wherein Hardy purported to give the Montgomerys a seven-day period to cure their default,

Hardy confirmed he would not finance the sale of the property. The court concluded that Hardy's decision not to sign the REPC, his July 2013 phone call, and his September 2013 letter "all amount[ed] to an anticipatory repudiation." Based on Hardy's anticipatory breach, the court determined that Hardy would be unjustly enriched if he were allowed to keep the full $7,000. After calculating Hardy's damages and offsetting them from the $7,000, the trial court entered judgment against Hardy for $1,990. Hardy appeals.

## ISSUES AND STANDARDS OF REVIEW

¶10    Hardy raises several arguments on appeal. First, he contends that he "could not anticipatorily repudiate the option agreement on which the Montgomerys had already defaulted." The trial court's "[f]indings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the credibility of the witnesses." Utah R. Civ. P. 52(a)(4). We review the trial court's conclusions of law for correctness. *Drazich v. Lasson*, 964 P.2d 324, 326 (Utah Ct. App. 1998).

¶11    Second, Hardy contends that "[t]he REPC is immaterial because the Montgomerys never performed the necessary consideration to exercise the option." In a related argument, he contends that "[t]he parties did not intend for the terms of the REPC to apply." Again, we will not set aside the trial court's findings of fact unless they are clearly erroneous, and we "give due regard to the trial court's opportunity to judge the credibility of the witnesses." Utah R. Civ. P. 52(a)(4).

¶12    Third, Hardy contends that he "did not waive his right to collect additional rents." Whether a contractual right has been waived presents a mixed question of law and fact. *See ASC Utah*,

*Inc. v. Wolf Mountain Resorts, LC*, 2010 UT 65, ¶ 11, 245 P.3d 184. "[W]hether the trial court employed the proper standard of waiver presents a legal question which is reviewed for correctness, but the actions or events allegedly supporting waiver are factual in nature and should be reviewed as factual determinations, to which we give a [trial] court deference." *Pledger v. Gillespie*, 1999 UT 54, ¶ 16, 982 P.2d 572.

¶13  Fourth, Hardy contends that the trial court incorrectly calculated late fees and liquidated damages. "[T]he adequacy of a damage award is a factual question and we will not reverse the trial court's findings unless they are clearly erroneous." *Tech Center 2000, LLC v. Zrii, LLC*, 2015 UT App 281, ¶ 5, 363 P.3d 566 (alteration in original) (citation and internal quotation marks omitted); *see also* Utah R. Civ. P. 52(a)(4).

¶14  Fifth, Hardy contends that he "is entitled to collect expenses and his attorney's fees." "Whether attorney fees are recoverable in an action is a question of law, which we review for correctness." *I-D Elec. Inc. v. Gillman*, 2017 UT App 144, ¶ 13, 402 P.3d 802 (citation and internal quotation marks omitted).


ANALYSIS

I. Anticipatory Repudiation

¶15  Hardy first argues on appeal that the trial court erred in ruling that the Montgomerys' alleged default in not timely paying the amount that Hardy considered to be the full rent did not constitute a breach of the agreement. Hardy contends that he "could not anticipatorily repudiate the option agreement on which the Montgomerys had already defaulted." We disagree.

¶16  Here, the trial court concluded that Hardy's decision not to sign the REPC, his July 2013 phone call with Jeremy

Montgomery, and his September 2013 letter "all amount[ed] to an anticipatory repudiation." The court then observed that, both at the time of Hardy's July 2013 phone call and his September 2013 letter, the Montgomerys "were not current with all financial obligations" and that the Lease Agreement allowed the Montgomerys "to exercise the option to purchase pursuant to the REPC at any time from September 15, 2013 through the end of the lease period, April 2014, if they were not in default." The court ultimately determined:

> It could be argued that the option terminated upon the Montgomerys' default. But a default only suspends the non-defaulting party's performance until it is discharged when the default amounts to a total breach. Though the Lease [Agreement] . . . defines a default, the Lease [Agreement] is silent as to the right to cure the default but also does not preclude it. Although the right to exercise the option was suspended by their breach, the Montgomerys had the right to cure the default, exercise the option and purchase the house pursuant to the REPC. Hardy's anticipatory repudiation breached the option agreement.

¶17 "An anticipatory breach occurs when a party to an executory contract manifests a positive and unequivocal intent not to render performance when the time fixed for performance is due." *Kasco Services Corp. v. Benson*, 831 P.2d 86, 89 (Utah 1992). "The other party can immediately treat the anticipatory repudiation as a breach, or it can continue to treat the contract as operable and urge performance without waiving any right to sue for that repudiation." *Id.*

¶18 Jeremy Montgomery testified at trial that in July 2013 Hardy told him over the phone that he no longer wished to sell

the house to the Montgomerys. Moreover, the September 2013 letter from Hardy's attorney stated that the Montgomerys still had "the ability to exercise an option to purchase the residence," but that Hardy was no longer "interested in financing the purchase of this property" based on the Montgomerys' late rent payments in May, June, and July 2013. The letter further stated that Hardy bore "no contractual (or other) obligation to finance the purchase of the property," that the REPC "was never executed or signed," and that the Lease Agreement "clearly states that the entire agreement is contained in the lease agreement and any additional agreements must be signed by all of the parties." The letter also informed the Montgomerys that they were in "material breach" of the Lease Agreement and provided that Hardy had "the option to terminate the entire agreement at his discretion *if [the Montgomerys] fail[ed] to remedy the breach of contract* by paying all associated late fees and damages *within 7 days of this notice*." (Emphases added.)

¶19 We conclude that Hardy's statements to Jeremy Montgomery in July 2013, and Hardy's statements in the September 2013 letter that he was "not interested in financing the purchase of this property" and that the Montgomerys would need to "find financing to purchase the property" constituted an anticipatory breach of the option agreement contained within the Lease Agreement. Although the Montgomerys were in default based on their failure to pay the accrued late fees, we ultimately agree with the trial court that the Montgomerys had the right to cure their default and that their "right to exercise the option was [only] suspended by their breach." As the trial court correctly observed, the Lease Agreement is silent as to the right to cure, but it also does not preclude the Montgomerys from curing their default. Before sending the September 2013 letter, Hardy never informed the Montgomerys that they were in default. Rather, in the same September 2013 letter in which Hardy first informed the Montgomerys they were in default, he

also informed them he was no longer going to provide financing for the purchase of the house. Importantly, however, Hardy also stated in the letter that he had "the option to terminate the entire agreement at his discretion *if [the Montgomerys] fail[ed] to remedy the breach of contract by paying all associated late fees and damages within 7 days of this notice.*" (Emphasis added.) Essentially, Hardy gave the Montgomerys a seven-day period in which to cure their default before he would terminate the agreement. By simultaneously reneging on his obligation to provide financing, Hardy failed to give the Montgomerys a reasonable opportunity to cure their default. In other words, Hardy should have actually given the Montgomerys the seven-day period to cure that he provided in his September 2013 letter before he reneged on his obligation to provide financing.

¶20   The Lease Agreement states, in relevant part, "Provided Tenant is not in default hereunder, Tenant shall have the right to purchase ('Option') the Premises for the Purchase Price of $126,775.00, ('Purchase Price') *at any time after September 15, 2013 and before the end of the Term of the Lease.*" (Emphasis added.) Although Hardy correctly observes that the Lease Agreement allowed him to "immediately terminate [the] Agreement" based on the Montgomerys' default, Hardy never sought to terminate the agreement before he reneged on his obligation to provide financing. Hardy did not seek to terminate the agreement in the September 2013 letter. Instead, he explicitly stated that he would give the Montgomerys an opportunity to cure their default before he would terminate the agreement. Consequently, the Montgomerys should have been able to exercise the option so long as they cured their default within seven days of Hardy's letter. Because Hardy reneged on his obligation to provide financing before giving the Montgomerys the chance to cure, we conclude that the trial court did not err when it determined that Hardy anticipatorily breached the option agreement.

## II. The REPC

¶21    Hardy contends that "[t]he REPC is immaterial because the Montgomerys never performed the necessary consideration to exercise the option." We are not persuaded. As previously discussed, Hardy's anticipatory breach effectively precluded the Montgomerys from exercising their option to purchase the home after they had paid $7,000 to Hardy as consideration for that option. Hardy backed out of providing financing before he sought to terminate either the Lease Agreement or the REPC.[1]

¶22    Hardy also contends that "[t]he parties did not intend for the terms of the REPC to apply." According to Hardy, "[s]ince all the parties are in agreement that they did not intend for the REPC to be binding, [he] could not anticipatorily repudiate an obligation to finance the purchase of the property."

¶23    In the trial court, Hardy argued that "the parties agreed the REPC was not binding." The trial court rejected this argument, stating that it "did not hear testimony or receive other evidence of any such agreement." The court further determined that the Lease Agreement "clearly integrates the REPC and seller financing addendum into the Lease" and that "the REPC and addendum are part of the Lease." We agree with the trial court that the REPC and seller financing addendum were incorporated into the Lease Agreement.

¶24    The Lease Agreement provides,

> Provided Tenant is not in default hereunder, Tenant shall have the right to purchase ("Option") the Premises for the Purchase Price of $126,775.00,

---

1. This was also the reasoning for the trial court's conclusion that "Hardy was unjustly enriched for the full $7,000.00."

> ("Purchase Price") at any time after September 15, 2013 and before the end of the Term of the Lease. As consideration for the Option, Tenant shall pay Landlord, a non-refundable option payment of $7,000.00 ("Option Payment"), payable on or before the beginning of the Term, which shall be applied to the Purchase Price and shall be counted toward the Earnest Money Deposit. In the event the Tenant exercises the Option to purchase the Premises, Tenant shall execute a Promissory Note for the balance remaining on the Purchase Price, after the Option Payment has been applied, and the parties shall close the transaction, as outlined in [the REPC], attached hereto as Exhibit "A", together with its applicable amendments, and addenda.

Based on the foregoing provision, we agree with the trial court that the REPC and seller financing addendum were incorporated into, and were a part of, the Lease Agreement. *See generally Peterson & Simpson v. IHC Health Services, Inc.*, 2009 UT 54, ¶ 15, 217 P.3d 716 ("Incorporation by reference requires that the reference . . . be clear and unequivocal, and alert the non-drafting party that terms from another document are being incorporated." (omission in original) (citation and internal quotation marks omitted)).

¶25    Regarding the REPC's binding effect, Hardy cites his trial testimony and testimony from the Montgomerys indicating that the parties did not intend for the REPC to be binding *unless and until* the Montgomerys exercised the option to purchase the house. Whether an agreement is a binding contract is to be determined like any other issue of contract interpretation—from all four corners of the agreement. *Café Rio, Inc. v. Larkin-Gifford-Overton, LLC*, 2009 UT 27, ¶ 25, 207 P.3d 1235. Under the parol evidence rule, only if a written contract is ambiguous concerning

a specific matter in the agreement do facts and circumstances existing prior to and contemporaneously with its execution become relevant to clarify the intent and purpose of the contract in that regard. *See Tangren Family Trust v. Tangren*, 2008 UT 20, ¶ 11, 182 P.3d 326. Parol evidence is not relevant for the purpose of varying and nullifying a written contract's clear and positive provisions. *Id.* Stated another way, the parol evidence rule excludes from evidence any oral testimony that would tend to add to, subtract from, or alter the terms of a clear and unambiguous written contract. *Id.*

¶26 Here, the plain language of the Lease Agreement and the REPC are clear and unambiguous and demonstrate that the parties intended the REPC to be binding in the event the option was exercised.[2] The Lease Agreement provided that if the Montgomerys exercised the option to purchase the house, "the parties shall close the transaction, as outlined in [the REPC], attached hereto as Exhibit 'A', together with its applicable amendments, and addenda." We have already determined that the REPC and seller financing addendum were thereby incorporated into the Lease Agreement, and the REPC and seller financing addendum outlined that Hardy, as the seller, would provide financing. Thus, we agree with the trial court's determination that the parties' trial testimony could not contradict their written agreement.

¶27 Moreover, Hardy's anticipatory breach precluded the Montgomerys from exercising the option to purchase the home.

---

2. It is true that there is a difference between an option contract and a purchase contract. But as long as the optionee has given sufficient consideration, the optionor cannot withdraw from the contract during the time set forth in the agreement. *See Coulter & Smith, Ltd. v. Russell*, 966 P.2d 852, 859 (Utah 1998).

Despite the fact that the Lease Agreement provided that the $7,000 would be "non-refundable," the trial court determined that because Hardy "foreclosed the Montgomerys['] exercise of the option by his repudiation," Hardy would be unjustly enriched if he were allowed to retain the full $7,000. It is telling that Hardy does not directly challenge the trial court's unjust-enrichment decision in his opening brief. Rather, he argues only that the Lease Agreement provided that the $7,000 would be "non-refundable."

¶28    It is worth noting that Hardy contends in his reply brief that, based upon the Montgomerys' default, the "Buyer Default" provision of the REPC allowed him to cancel the REPC and retain the earnest money deposit as liquidated damages. However, Hardy did not treat the $7,000 as an earnest money deposit pursuant to the terms of the REPC, which required him to "deposit the Earnest Money into [a] Brokerage Real Estate Trust Account" within four days of receipt. Instead, he treated the $7,000 as an option payment and deposited it into his personal checking account. Additionally, Hardy did not terminate the REPC; he merely withdrew his promise to provide seller financing as outlined in the REPC. Thus, the "Buyer Default" provision of the REPC does not help Hardy. Moreover, as a general matter, Hardy cannot selectively apply the terms of the REPC, i.e., he cannot persuasively argue in his opening brief that the REPC does not apply and also argue in his reply brief that selective terms of the REPC (those favorable to him) do apply.

¶29    In sum, we agree with the trial court's determination that Hardy was bound by the terms of the Lease Agreement and the REPC to provide financing, and that he anticipatorily breached that agreement when he told the Montgomerys he did not want to sell them the house and told them he would no longer provide financing before he gave the Montgomerys a chance to cure their

default (within the time period to cure he provided in his September 2013 letter) and then exercise their option.

## III. Waiver

¶30   Hardy contends that he did not waive his right to collect additional rents.

¶31   The Lease Agreement provides that the Montgomerys were required to pay $700 per month in rent, along with "additional rent" of $100 per month "to reimburse [Hardy] for the estimated property taxes and insurance." The Montgomerys failed to pay the additional $100 for the entirety of the lease.[3]

¶32   Also relevant here, the Lease Agreement, under a provision entitled "NON-WAIVER," provides that "[n]o failure of Landlord to enforce any term hereof shall be deemed a waiver, nor shall any acceptance of a partial payment of rent be deemed a waiver of Landlord's right to the full amount thereof."

¶33   In deciding whether Hardy waived the monthly $100 in additional rent, the trial court observed that "Hardy never told the Montgomerys that the rental payment was in the wrong amount" and that the September 2013 letter from Hardy's attorney did not demand the additional $100 per month "even though the letter details other amounts owing and references several provisions of the Lease." Based on these facts, the trial court concluded that Hardy had "intentionally waived the right to collect the additional $100.00 each month in rent."

---

3. In its written findings, the trial court observed that the Montgomerys had testified that Hardy told them they did not have to pay the $100 per month until they purchased the house, but the court never made any determination about the credibility of that testimony.

¶34   "A waiver is the intentional relinquishment of a known right. To constitute a waiver, there must be an existing right, benefit or advantage, a knowledge of its existence, and an intention to relinquish it." *Soter's, Inc. v. Deseret Fed. Sav. & Loan Ass'n*, 857 P.2d 935, 937 (Utah 1993) (citation and internal quotation marks omitted). "[T]he intent to relinquish a right must be distinct." *Id.* at 942. "[M]ere silence is not a waiver unless there is some duty or obligation to speak." *Id.* at 940 (citation and internal quotation marks omitted). "Under this legal standard, a fact finder need only determine whether the totality of the circumstances warrants the inference of relinquishment." *Id.* at 942 (citation and internal quotation marks omitted). "While a no-waiver provision is one element to be considered in analyzing whether waiver has occurred, it is not determinative." *ASC Utah, Inc. v. Wolf Mountain Resorts, LC*, 2010 UT 65, ¶ 37, 245 P.3d 184; *see also Living Scriptures, Inc. v. Kudlik*, 890 P.2d 7, 10 n.5 (Utah Ct. App. 1995) (observing that rather than viewing a nonwaiver provision as a complete bar to a finding of waiver, "the best approach is to view the existence of an antiwaiver provision as merely one factor to consider in determining whether a party has waived its rights under the agreement").

¶35   The trial transcript indicates that the nonwaiver provision of the Lease Agreement was brought to the trial court's attention during trial. First, Jeremy Montgomery read the nonwaiver provision from the stand during trial. Second, in closing argument, Hardy's counsel observed, "[Hardy] didn't give them a notice of default, but there is a waiver clause in the contract that says Mr. Hardy can exercise his rights at any time." However, the trial court did not explicitly address the nonwaiver provision in its findings. Given that a nonwaiver provision is a "factor . . . in determining whether a party has waived its rights under the agreement," *Living Scriptures*, 890 P.2d at 10 n.5, the trial court should have addressed the effect of the nonwaiver

provision on this issue. It is impossible for us to discern whether the trial court overlooked the nonwaiver provision altogether or simply determined that the other evidence indicating waiver outweighed the nonwaiver provision.

¶36    Based on the foregoing, we vacate the waiver portion of the trial court's decision and remand for a reconsideration of the issue, including the entry of explicit findings regarding the nonwaiver provision of the Lease Agreement.

## IV. Late Fees and Liquidated Damages

¶37    Hardy contends that "[l]ate fees and damages were calculated incorrectly." The resolution of the waiver issue discussed above directly relates to Hardy's arguments regarding the trial court's calculation of late fees and liquidated damages. The Lease Agreement provides,

> Rents that are more than five days late are subject to a late fee of 10% of the total monthly installment. If the rental installment is paid after the 10th, Tenant agrees to pay an additional $10.00 per day as liquidated damages from the 10th until all rent, penalties, cleaning and/or damage charges, utility bills, fines and late fees are paid in full.

¶38    The trial court determined that the Montgomerys' only late payments occurred in June and October 2013. Because the trial court determined that Hardy had waived the additional monthly rent of $100, the court calculated the late fee amount with reference to $700 per month, resulting in $140 in late fees (10% of $700 = $70 x 2 months = $140). Upon resolution of the waiver issue dealt with in Part III, this amount may need to be recalculated with reference to $800 per month in rent.

¶39 In addition, Hardy argues that because the Montgomerys never paid the $800 called for by the Lease Agreement, the trial court was "incorrect in determining that the Montgomerys were only late for June and October's rent." According to Hardy, the Montgomerys "should be responsible for late fees for every month of the lease agreement." This argument may be persuasive if Hardy prevails on the waiver issue. Therefore, in light of our remand for additional findings with respect to waiver, the trial court should accordingly reevaluate late fees and liquidated damages.

## V. Attorney Fees

¶40 Hardy contends that he "is entitled to collect expenses and his attorney's fees." The trial court declined to award either party attorney fees, observing that "each party prevailed only on certain aspects of their claims."

¶41 The Lease Agreement provides, "Should it become necessary for Landlord to employ an attorney to enforce any of the conditions or covenants hereof, including the collection of rentals or gaining possession of the Premises, Tenant agrees to pay all expenses so incurred, including a reasonable attorney's fee."

¶42 "In Utah, attorney fees are awardable only if authorized by statute or by contract." *Wing v. Code*, 2016 UT App 230, ¶ 12, 387 P.3d 601 (citation and internal quotation marks omitted). "Under Utah's Reciprocal Fee Statute, courts may award attorney fees to the prevailing party of a contract dispute so long as the contract provided for the award of attorney fees to at least one of the parties." *Id.* More specifically, Utah's Reciprocal Fee Statute provides, "A court may award costs and attorney fees to either party that prevails in a civil action based upon any promissory note, written contract, or other writing . . . when the

provisions of the promissory note, written contract, or other writing allow at least one party to recover attorney fees." Utah Code Ann. § 78B-5-826 (LexisNexis 2012).

¶43 Hardy asserts that "[s]ince only [his] claims are justified, . . . reciprocity of attorney's fees does not apply and [he] should be entitled to collect his expenses and a reasonable attorney's fee." However, the trial court determined that "each party prevailed only on certain aspects of their claims," and we have affirmed several of the trial court's decisions. Moreover, a trial court may weigh competing claims and decide that neither party is entitled to an award of attorney fees. *Cf. Anderson & Karrenberg v. Warnick*, 2012 UT App 275, ¶¶ 13–14, 289 P.3d 600. Accordingly, we conclude that the trial court did not err in declining to award either party attorney fees below.

¶44 Hardy also asserts that his "attorney fees should include fees [he] incurred as a result of having to bring this matter before the court of appeals." Likewise, the Montgomerys assert that they should be awarded their attorney fees and costs associated with Hardy's appeal. In view of our affirmance of the trial court's decision not to award either party attorney fees incurred below, we decline both parties' invitations to award attorney fees incurred on appeal.[4]

---

4. In light of our discussion in footnote 5, *infra*, regarding Hardy's intemperate briefing, Hardy is fortunate we are not assessing the Montgomerys' attorney fees against him. *See* Utah R. App. P. 24(i) ("The court on motion or on its own initiative may strike or disregard a brief that contains burdensome, irrelevant, immaterial, or scandalous matter, and the court may assess an appropriate sanction including attorney fees for the violation.").

CONCLUSION

¶45 Hardy was bound by the Lease Agreement and the REPC to finance the sale of the home, and we agree with the trial court that his renunciation of that promise constituted an anticipatory breach. However, we vacate the trial court's decision as to whether Hardy waived his right to collect additional rents and remand for further findings on this issue and for possible re-evaluation and re-calculation of late fees and liquidated damages. Finally, we decline to award attorney fees to either party on appeal.[5]

_____

5. We note that Hardy's opening brief contains several disrespectful and offensive statements directed toward the trial court, including (1) "the lower court is either clueless, completely negligent . . . , or it bears significant bias against Hardy," and (2) "the lower court was at a minimum derelict in its duties" and was "significantly confused and erratic in its findings." We caution Hardy's counsel that "personal attacks on the integrity of judges of this or any other court or statements that are generally disrespectful of the judiciary or ascribe improper motives to a court or judges 'overstep[] the bounds of appropriate appellate advocacy,' and may subject [counsel] to sanctions that can include, among other things, striking the filings in which they appear" or assessing attorney fees. *Bryner v. Department of Public Safety*, 2016 UT App 199, ¶ 6, 382 P.3d 1078 (per curiam) (first alteration in original) (quoting *Peters v. Pine Meadow Ranch Home Ass'n*, 2007 UT 2, ¶ 8, 151 P.3d 962); *see also Peters*, 2007 UT 2, ¶¶ 20, 23 (striking the petitioners' briefs, assessing the respondent's attorney fees against the petitioners' counsel, and observing that, "[e]ven where a lawyer's unprofessionalism or incivility does not warrant sanctions, it often will nevertheless diminish his or her effectiveness"); Utah

(continued…)

(…continued)

R. Prof'l Conduct 8.2(a) ("A lawyer shall not make a public statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge, adjudicatory officer or a candidate for election or appointment to judicial office.").

Hardy's reply brief also alleges that the Montgomerys acted in "bad faith" and made a "conscientious decision . . . to mislead this Court." Standard 1 of the Utah Standards of Professionalism and Civility states, in relevant part, that "lawyers shall treat all other counsel, parties, judges, witnesses and other participants in all proceedings in a courteous and dignified manner." Standard 3 of the Utah Standards of Professionalism and Civility states,

> Lawyers shall not, without an adequate factual basis, attribute to other counsel or the court improper motives, purpose, or conduct. Lawyers should avoid hostile, demeaning, or humiliating words in written and oral communications with adversaries. Neither written submissions nor oral presentations should disparage the integrity, intelligence, morals, ethics, or personal behavior of an adversary unless such matters are directly relevant under controlling substantive law.

We stop short, in this case, of striking Hardy's brief or otherwise sanctioning counsel, but we direct counsel to refrain from making such comments in future filings.